The PURE OIL COMPANY
v.
M/V CARIBBEAN and Caribbean
Towing Co.

CARIBBEAN TOWING CO.
v.
M/V DIANA BRENT and Brent Towing
Co., Inc.

SILVEY–TAYLOR BARGE CO.
v.
TUG CARIBBEAN and Caribbean
Towing Co.

CARIBBEAN TOWING CO.
v.
M/V DIANA BRENT and Brent Towing
Co., Inc.

Nos. 8736, 9018.

United States District Court
W. D. Louisiana,
Lafayette Division.

Nov. 3, 1964.

Deutech, Kerrigan & Stiles, Paul A. Gaudet and H. Barton Williams, New Orleans, La., for libelant and respondent in cross-libel, The Pure Oil Co.

Faris, Leake & Emmett, J. Y. Gilmore, Jr., New Orleans, La., for respondents, Caribbean Towing Co. and M/V Caribbean.

Lemle & Kelleher, George A. Frilot, III, New Orleans, La., for impleaded respondents and cross-libelants, Diana Brent and Brent Towing Co.

PUTNAM, District Judge.

The Pure Oil Company, owner of a cargo of petroleum products laden on board the Barge NBC 934, instituted a libel against the M/V Caribbean and Caribbean Towing Company for damages to its cargo arising out of the collision between the tow of the M/V Caribbean and the tow of the M/V Diana Brent. C. J. Boyne, E. W. Lasseigne and Edward Boyne, the partners comprising Caribbean Towing Company, claimed the M/V Caribbean, answered and impleaded the M/V Diana Brent and Brent Towing Company, Inc. Silvey-Taylor Barge Company instituted a libel against the Tug Caribbean and Caribbean Towing Company for damages to its Barge NBC 934 arising from the same collision. Caribbean Towing Company claimed the Caribbean, answered and impleaded the Diana Brent and Brent Towing Company, Inc. Brent Towing Company, Inc. claimed the M/V Diana Brent, answered both impleaders and the cases were consolidated for purposes of trial. Brent Towing Company, Inc. then filed a cross-libel against Pure Oil Company seeking recovery, under contractual relationships, for any contingent liabilities to Pure as a result of the impleaders. The Pure Oil Company excepted to the cross-libel and the question of liabilities between Brent Towing Company, Inc. and the Pure Oil Company was referred to the merits. Trial was held on April 15–16, 1964, and evidence was adduced on all issues. The matter was submitted on the question of fault between the Caribbean and the Diana Brent and their respective owners and held open for further testimony in regard to the contractual issues between Pure Oil Company and Brent Towing Company, Inc.

## FINDINGS OF FACT

1. On the evening of April 19, 1961, the M/V Diana Brent, a 900 horsepower single screw tug, about 75 feet long, owned and operated by Brent Towing Company, Inc. was upbound in the Atchafalaya River pushing three barges in tandem. Her lead barge was NBC 934, owned by Silvey-Taylor Barge Company, and her tow was approximately 645 feet in length.

2. On the same date, the M/V Caribbean, a steel tug approximately 65 feet long, powered by two engines developing approximately 1000 horsepower and pushed by twin screws, owned and operated by a partnership composed of C. J. Boyne, F. W. Lasseigne and Edward Boyne, was downbound in the Atchafalaya River pushing two loaded barges in tandem. The Barge LBTCO 22 (ex COLLE 122) was the lead barge and the MS 4 was faced up to the Caribbean. The Caribbean's tow was about 480 feet in length.

3. The night was clear and the Atchafalaya River was at a high stage, overflowing its banks in the area of the ultimate casualty. The current was strong at between 5 and 7 miles per hour.

4. Just above Mile 13, the Atchafalaya River bends nearly 90° to the left for upbound traffic. Approaching the bend, the Diana Brent and her tow were holding near the right descending bank. As she made the turn leading into the straight reach above Mile 13, however, the Diana Brent drove her tow 150 feet to 300 feet into the channel before she began to pivot. The sweep of the current caused the Diana Brent to drift off to the center of the channel by the time she straightened up.

5. As the Diana Brent made her turn, she came into view of the descending Caribbean, two to three miles above her. The Caribbean, in the straight reach, was holding to her starboard side of the river, nearer to the bank than to the middle of the channel. Her captain, atop the pilot house fixing a spot light, saw the Diana Brent's red light as she came out of the bend and, shortly thereafter, the Diana Brent showed both her red and green lights as she rounded up. This indicated an end on meeting situation.

6. As the tows came end on, the mate of the Caribbean, at her wheel, sounded a single blast of her whistle. At about this same time, and when the tows had closed to within one mile of one another, the mate of the Diana Brent, at her wheel, sounded two blasts on her whistle. Neither vessel heard the proposed passing signal of the other, probably because they were simultaneously made. The Diana Brent was then making about 4 miles per hour over the ground and steering toward her left ascending bank, which she wished to follow upriver to take advantage of slack water. The Caribbean, with the strong current underfoot, was making about 12 to 14 miles per hour. There was a closing range rate between the two flotillas of 15 to 16 miles per hour.

7. The Diana Brent continued to steer toward her left ascending bank and closed her red light to the Caribbean. The Caribbean sounded a danger signal and reversed her engines when the flotillas had closed to less than one-half mile (the testimony varies from 200 feet to 2000 feet, but we find that this occurred when the flotillas were well within one-half mile, and probably within 1000 feet when the Caribbean so acted). At a distance of less than one-quarter mile, the Diana Brent sounded a danger signal and began backing on her engines. Thereafter, the Diana Brent drove her tow into the left ascending bank on an angle and, at about that time, the starboard bow of the lead barge of the Caribbean collided with the starboard side of the NBC 934 about 50 feet aft her bow corner. The NBC 934 was holed and part of her petroleum cargo spilled into the river.

## RELATIONSHIP OF PURE AND BRENT TOWING, ETC.

■■ At the outset, we overrule the exception of Pure to the cross-libel filed by Brent. The latter, being an impleaded respondent in Pure's original action, stands charged with fault to the same extent as if it were originally named. Benedict on Admiralty, Vol. 2, § 351, p. 538, et seq. The cross-libel grows out of the provisions of the contract under which Pure's cargo was being transported. This is germane to the matters placed before the Court, and may properly be made the subject of a cross-libel.

Since we have heard all of the evidence to be offered by either side on these issues, we now decide the motion for summary judgment filed by Pure with the merits of the bill, and proceed with our findings of fact.

8. By contract effective January 1, 1958, Silvey-Taylor agreed to move bulk cargo consisting of petroleum products for Pure, and to provide therefor a tug known as M/V Valto, Barges NBC 933, NBC 934, NBC 1076, or equivalent substitutes, for a specified rate. (Diana Brent, Exhibit 3)

9. This contract contained the following clause, limiting the liability of Silvey-Taylor:

"INSURANCE AND MARINE PERILS:

"Owner shall carry at its expense Hull and P&I insurance (but not tower's liability covering cargo) to

the full value of the tow used in the fulfillment of this contract. Company hereby acknowledges that the towage rate specified herein does not contemplate or include an allowance for liability insurance covering the cargo and as an additional consideration supporting owner's undertakings, company shall and it does hereby agree to hold owner, its tow, masters, crew, agents and employees harmless for claims for cargo loss, damage or contamination whether arising or resulting from an act of neglect or default in the navigation or management of the vessel, including but not limited to, explosion, fire collision, stranding, salvage operations, equipment defect, or other peril, danger or accident of navigable waters or from any other cause of whatsoever kind arising. In furtherance hereof, company agrees to insure the cargo transported hereunder to its full value against all marine perils, including loss, damage or contamination, salvage or general average contribution, etc. and to secure a waiver of assignment and/or subrogation from the cargo underwriters in favor of owner on account of any cargo claims paid by the underwriters."

10. On October 3, 1960, Silvey-Taylor contracted with Brent to furnish a tug, manned and victualled, for the performance of the abovementioned contract with Pure, for a consideration of 65% of the revenues collected for towing such products, in the barges owned by Silvey-Taylor. (Diana Brent, Exhibit 4) This contract contained the following provisions:

"INSURANCE: Tower, at its own expense, shall insure the towing vessels furnished pursuant to this agreement with first-class underwriters against both Hull and P&I risks, including collision and Tower's liability clauses, to the full value of each such vessel. Charterer, at its own expense, shall insure the barges pursuant to this agreement with first-class underwriters against both Hull & P&I risks. It is mutually agreed by both parties that the shipper will provide all cargo insurance and that neither the Charterer nor the Tower will be responsible for any loss or damage to the cargo.

"Tower and Charterer agree to waive right of subrogation against the other at no expense to either."

11. The uncontradicted testimony of the witness Lamar Silvey establishes that the M/V Valto became inoperative, and Tugs of Brent Towing were substituted therefor, with the consent of Pure. Although the Court held the record open, to permit Pure to take the deposition of its representative with whom these arrangements were made or to show other contradictory evidence, none has been produced. This substitution of vessels in the Silvey-Taylor contract with Pure was made verbally, after confection of the original agreement, and the parties thereto continued operations in accordance with the original terms of the contract with full knowledge of all of the circumstances under which the services were being rendered.

12. Pure carried insurance on the cargo carried pursuant to its agreement with Silvey-Taylor, and has been paid the amount of its losses by its insurance carrier, Home Insurance Company. (Answer to interrogatories by letter of counsel, Diana Brent, Exhibit 5.)

13. Damages to Pure's cargo, part of which was lost as a result of the collision heretofore discussed, are stipulated to be in the total sum of $8,900.00.

## CONCLUSIONS OF LAW

(a). The Court has jurisdiction of this action and venue is properly laid in the Western District of Louisiana, 28 U.S.C. § 1333.

■ (b). The Diana Brent and those in charge of her were at fault in failing to sound a timely passing signal. The descending Caribbean was seen by the Diana Brent at a distance of about two miles but the mate of the Diana Brent

waited until the vessels had closed to within one mile of one another and to a point about 1800 feet below the location of collision to discharge his obligation under Rule 18(b) of the Western Rivers Rules, 33 U.S.C.A. § 343, of sounding the first passing signal. This fault was a proximate, contributing cause of the collision, under all of the circumstances of this case.

■ (c). The Diana Brent and those in charge of her were further at fault in failing to timely sound a danger signal and reverse engines. She took no action, after her proposed and unanswered two-whistle signal, while the vessels closed, head and head, approximately three-quarters of a mile, and reversed and sounded four blasts only when the tows were within one-quarter of a mile of one another. Rules 24(a) and 25, 33 U.S.C.A. §§ 349(a), 350. The failure to take appropriate action during this interval was a proximate, contributing cause of the collision, The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126.

■ (d). Under Rule 18 of the Pilot Rules for Western Rivers, 33 U.S.C.A. § 343, applicable hereto, the descending Caribbean was the privileged vessel. In this meeting situation, the upbound Diana Brent chose to suggest a starboard-to-starboard passing, according to her mate's testimony, and attempted to so pass, prior to whistle confirmation by the Caribbean. To undertake this starboard passing without consent of the Caribbean was a clear fault since the Diana Brent's mate, an experienced mariner, knew, or should have known, that the Caribbean, with the strong current underfoot, would have difficulty steering toward the left descending bank. This fault was a proximate, contributing cause of the collision.

■ (e). The Caribbean and those in charge of her were at fault in sounding the first proposed passing signal, contrary to Rule 18. This one-blast whistle may have drowned out the Diana Brent's two-blast signal. Under any circumstances, it was not shown that this statutory violation could not have con-

tributed to the casualty and it must be considered a proximate, contributing cause, The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874).

■ (f). The Caribbean was further at fault in failing to put her wheel over to port as the red light of the Diana Brent closed out. This failure of the Caribbean to attempt to maneuver toward her left descending bank was a proximate, contributing cause of the collison.

■ (g). The Caribbean, like the Diana Brent, failed to timely sound a danger signal. According to her mate's testimony, the vessels were about 2000 feet apart when he gave four blasts and began backing. This violation of the half-mile rule was a proximate, contributing cause of the collision.

■ (h). The Diana Brent and the Caribbean were jointly and equally at fault for the collision between their tows. Under these circumstances damages should be divided.

■ (i). The contract between Pure and Silvey-Taylor is a contract of affreightment, for the movement and transportation of Pure's products as therein set forth. Sacramento Nav. Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1938); Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

■ (j). The tug and the barges being towed constitute but one vessel. It would be futile to engage a barge having no motive power of its own to transport goods. Sacramento Nav. Co. v. Salz, supra.

■ (k). In private contracts of affreightment, the relationship between the parties is that of bailor-bailee, and the rights and obligations of one to the other are to be determined according to the terms of their agreement. Sacramento Nav. Co. v. Salz, supra, Commercial Molasses Corp. v. New York Tank Barge Co., supra, Koppers Connecticut Coke Co. v. James McWilliams B. Line,

89 F.2d 865 (2 Cir. 1937, cert. den. 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545 1937); Texas Co. v. Lea River Lines, Inc., 206 F.2d 55 (3 Cir. 1953). Cf. Hartford Accident & Indem. Co. v. Gulf Ref. Co., 127 F.Supp. 469 (E.D.La.1954).

▇▇▇ (1). The agreement between Silvey-Taylor and Brent Towing is a time or voyage charter, for the fulfillment of the terms of the contract of affreightment. See Guzman v. Ruiz Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed. 2d 205 (1962), and authorities cited. The control of this vessel and its crew remained with the owner, Brent Towing Co., subject to the orders of Silvey-Taylor as to where and when the services were to be performed.

▇▇▇ (m). The rule of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955); Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955), as broadened and explained in Dixilyn Drilling Corp. v. Crescent T. & S. Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), prohibits and renders invalid provisions in towage contracts exculpating the tower from liability resulting from his own negligence or that of his agents, servants and employees.

▇▇▇ (n). In the present case, the contract between Pure and Silvey-Taylor was not to tow a vessel or a barge, but one to transport goods. As such, it is not a towage contract. The rule in Bisso, supra, has nothing to do with the responsibility of a "private carrier to a shipper where the carrier alone controls the entire means of transportation, whether a single vessel or tug and tow." Texas Co. v. Lea River Lines, supra, 206 F.2d p. 57; see also: Koppers Connecticut Coke Co. v. James McWilliam B. Line, supra, cf. Mississippi Valley Barge Line Co. v. T. L. James & Co., 244 F.2d 263 (5 Cir. 1957).

▇▇▇ (o). By subsequent agreement and acquiescence, Pure allowed and was a party to the substitution of tugs operated by Brent Towing Company to provide motive power for the Silvey-Taylor barges, which, by themselves, were as ineffectual as a freight car without a locomotive to reach the desired object. Sacramento Nav. Co. v. Salz, supra, Texas Co. v. Lea River Lines, supra.

(p). In view of the substitution to which Pure agreed, for all purposes of Silvey-Taylor's contract with Pure Brent Towing Company and its vessels were identified with the interest of Silvey-Taylor, and the relationship of separate interests between Tug and Tow, found to exist in the Bisso and Winding Gulf cases, supra, is not present here.

▇▇▇ (q). We conclude that, quoad Pure, Brent Towing Company and its vessels stand in the shoes of Silvey-Taylor and are entitled to claim the benefit of the provisions of its contract of affreightment exonerating them from liability for loss of cargo according to its terms. Under circumstances such as we find here, where the parties contracted freely, at a fair rate which expressly takes into consideration economic factors bearing upon the services performed, public policy does not require that the provisions of this contract be stricken.

▇▇▇ (r). The contract between Brent Towing and Silvey-Taylor is clearly a contract of towage. Under the rule of Bisso v. Inland Waterways Corp., supra; Boston Metals Co. v. The Winding Gulf, supra; and Dixilyn Drilling Corp. v. Crescent T. & S. Co., supra, the provisions of the contract quoted in paragraph 10 of the findings of fact above, cannot operate to relieve Brent of liability for the negligence of its tug, or of its agents and employees, to Silvey-Taylor.

### ORDER

The Court has yet to receive evidence on the question of damages occasioned by this collision to the vessels involved. The Clerk will return the matter to the trial docket for this purpose.

When this has been determined, they will be divided and judgment entered accordingly.

Damages to the cargo, totaling $8,900.-00 will also be divided, with Brent Tow-

ing Company and/or the M/V Diana Brent relieved from responsibility for their one-half share.

Parties for the respective parties will agree upon formal decree to be entered on the questions of fault and liability as above set forth, in each of the two cases consolidated for trial. This should be accomplished and submitted for signature within twenty days of this date.

If the parties are unable to agree on the form of decree to be entered, the Court will be informed immediately and will formulate judgments accordingly.