**FALL RIVER LINE PIER, INC.,**
Defendant, Appellant,

v.

**INTERNATIONAL TRADING CORP. OF VIRGINIA, Inc., et al., Plaintiffs,**
Appellees.

No. 7076.

United States Court of Appeals.
First Circuit.

Aug. 13, 1968.

John F. Dargin, Jr., Boston, Mass., with whom Orfanello & Dargin, Boston, Mass., was on the brief, for appellant.

No appearance for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

The difficult question in this case is how large a fish may be caught on a small hook. Cf. Lawrence v. SEC, 1 Cir., 7/11/68, 398 F.2d 276. Defendant Fall River Line Pier, Inc., is a municipally-owned corporation which operates the rejuvenated dock of the old Fall River Line. By its letterhead it advertises the pier's availability for ships of all sizes. During the years in question, 1959–61, however, two affiliated cement companies, International Trading Corporation of Virginia, Inc. and International Trading Corporation of New England, plaintiffs, and a competitor, Foreston Coal Co., were defendant's only customers. Each imported cement in foreign bottoms by contract carriage. In 1961 plaintiffs discovered that defendant had given Foreston more favorable storage rates, and complained to the Federal Maritime Commission. As a result proceedings were had and plaintiffs obtained an administrative finding from the Commission requiring defendant to pay plaintiffs some $12,000 to offset the found discriminations. Plaintiffs sued thereon, pursuant to 46 U.S.C. § 829, in the District Court, which held that the Commission's findings were prima facie

correct and had not been rebutted. 276 F.Supp. 211.

■ Because the cement was brought in by contract carriage, the present appeal raises, basically, the question of the Commission's jurisdiction. Such exists, if at all, in respect to defendant *if it is an "other person"* within the act, which is defined as a person " * * * furnishing wharfage, dock, warehouse, or other terminal facilities *in connection with a common carrier by water.*" 46 U.S.C. § 801. (Ital. suppl.) In the district court defendant's witness, in support of the contract nature of the operations, testified that the vessels landing cement at its pier were "tramp steamers," very possibly intending to call into play the provision in section 801, "That a cargo boat commonly called an ocean tramp shall not be deemed such 'common carrier by water in foreign commerce.'" The district court made no specific response to this testimony except to rule that "no new evidence was introduced in this court sufficient to overcome the prima facie case made by the admission in evidence of findings and order of the Maritime Commission."[1] We agree. The court did not need to take the witness' characterization of the vessels as "tramps" as rebutting the Commission's detailed findings. See United States v. Stephen Bros. Line, 5 Cir., 1967, 384 F.2d 118. We turn, therefore, to the basis of the Commission's finding that the defendant was subject to the act because of certain common carriage activities, admitting that the cement itself was carried by special contract.

> "During the period from February 28, 1959 through January 3, 1961, there were 33 ships and 1 barge which docked at respondent's pier. Except for the barge which discharged only paper rolls, one ship which discharged 290.5 tons of general cargo on January 3, 1961, and two ships which in addition to bagged cement also discharged coil wire or office furniture for unknown consignees, the aforesaid ships discharged only bagged cement at Fall River. The cement was imported by complainant or its competitor, Foreston Coal Company (Foreston), and in each case was carried in a ship of foreign registry. Some of the ships of Swedish registry were operated by Thorden Lines which advertised in 1961 the availability of cargo, refrigerated and deep tank space on its vessels sailing between certain Swedish ports and Boston, Philadelphia, Baltimore, Hampton Roads and New York, but not Fall River. The manifest covering one voyage of the Thorden Line's ships in May 1959 shows that in addition to the discharge of bagged cement and office furniture at the Fall River pier miscellaneous general cargo was discharged at New York, Philadelphia, Baltimore, Newport News and Norfolk. The latter freight included diverse commodities ranging from edibles and potables to chemicals and manufactured goods."

In a subsequent portion of its opinion, under the heading "Discussion," the Commission said,

> "The question to be decided here is whether respondent has furnished its services in connection with a common carrier by water. There is evidence in this record that common carriers call at respondent's pier at Fall River. In response to a direct question from the Chairman, counsel for respondent admitted that some general cargo was in fact discharged at the pier. There is further evidence, a vessel manifest, that at least one ship carrying general

---

1. 276 F.Supp. 213. The Commission's findings are "prima facie evidence of the facts stated." 46 U.S.C. § 829; Roberto Hernandez, Inc. v. Arnold Bernstein Schiffahrtsgesellschaft, 2 Cir., 1941, 116 F.2d 849, cert. denied 313 U.S. 582, 61 S.Ct. 1101, 85 L.Ed. 1539.

cargo called at respondent's pier during the period under consideration."[2]

■■ A carrier may undertake both common and contract carriage. Express Cases, 1886, 117 U.S. 1, 6 S.Ct. 542, 628, 29 L.Ed. 791; United States v. Louisville & Nashville R. R., 6 Cir., 1955, 221 F.2d 698. The question accordingly becomes whether a pier similarly serving both is subject to regulation with respect to contract carriage because on a few occasions it also serves common carriage. This question we regard as involving no different considerations from those affecting the shipping company itself. The manifest and sole purpose of including persons "furnishing [services] * * * in connection with a common carrier by water" is to complete the cycle and prevent evasion of the controls which the Commission legitimately exercises over the carrier.[3]

It is to be noted that, unlike the Interstate Commerce Act, which deals specifically and separately with common carriers by water and contract carriers by water, e. g., 49 U.S.C. §§ 902(d), (e), 906(d), (e), the Shipping Act speaks only of a "common carrier by water," 46 U.S.C. § 801, and provides, "No common carrier by water shall, directly or indirectly, in respect to the transportation by water of passengers or property between a port * * *." do certain acts. 46 U.S.C. § 812. In Grace Line, Inc. v. Federal Maritime Board, 2 Cir., 1960, 280 F.2d 790, cert. denied 364 U.S. 933,

81 S.Ct. 380, 5 L.Ed.2d 365, a divided court supported the Board's exercise of jurisdiction over contract carriage where the carrier also handled a considerable amount of freight as a common carrier. The court's rationale was in two parts: the desirability of encouraging a merchant marine, and the determination that it would be unreasonable to limit "common carrier" in the act by the phrase "while acting as such." In Flota Mercante Grancolommbiana, S. A. v. Federal Maritime Commission, 1962, 112 U. S.App.D.C. 302, 302 F.2d 887, the court followed *Grace Line*, without substantial discussion.

■ We have some question whether these cases were correctly decided in light of the statutory language noted above.[4] Even if they were, we do not find them controlling. The case at bar involves vessels having no connection with the merchant marine, and only incidentally concerned with common carriage as distinguished from the extensive common carriage operations of the Grace Line, see Banana Distributors, Inc. v. Grace Line, Inc., 5 F.M.B. 617 (1959). At a minimum there should have been a finding, or a factual basis supporting a finding, that the common carriage here was of sufficient consequence to be affected by the contract carriage. Cf. Puerto Rican Rates, 2 F. M.C. 117, 126–27 (1939). Short of this we see no basis for the Commission's concern with the defendant's contract

2. This was immediately followed by the sentence:

"It is clear that respondent held itself out as a modern terminal capable of servicing any type of ocean common carrier and that it made no effort to restrict its services to contract carriers."

We take this to mean that if defendant dealt with common carriage the business was not an inadvertence which it strove to avoid. We accept this, but it does not answer the main question.

3. Consistent with this purpose we find no merit in defendant's attempted distinction between docking and unloading charges, wherein defendant made no discrimination against the plaintiffs, and

storage charges, in which it did. See State of California v. United States, 1944, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322.

4. Rather than the shipping company seeking to add the phrase "while acting as such" after "common carrier by water" in section 812, supra, it may be the Commission which is seeking to add "whether by common carriage or otherwise" after "property." *Grace Line* was criticized in Contract Carriage by Common Carriers Under the Shipping Act of 1916, 70 Yale L.J. 1184 (1961); Shipping Act: Contract v. Common Carriage, 18 Wash. & Lee L.Rev. 259 (1961).

carriage activities. The Shipping Act was enacted long before the Interstate Commerce Act, but in light of Congress' careful attempt to reconcile the two acts, 49 U.S.C. § 920, see Consolo v. Federal Maritime Commission, 1966, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131, we cannot read the omission of contract carriage as inadvertent or inconsequential. It follows that the complaint, founded upon a finding for which the Commission lacked jurisdiction, must be dismissed.

■■ Conversely, the district court dismissed the defendant's counterclaim when it should have supported it. By its counterclaim defendant sought to recover unpaid charges for use of defendant's pier facilities. The court entered judgment for the defendant in counterclaim on the ground that, while trial below was proceeding, plaintiff in counterclaim had recovered a judgment on the same claim in the state court and "[n]o useful purpose would be served by giving Fall River Line Pier a second judgment and Execution for the same cause of action." 276 F.Supp. at 213. We know of no basis for such discretion. Had the counterclaim been unamended, dismissal might well have been proper on the ground that appellant's cause of action had merged in his state judgment. E. g., Schuler v. Israel, 1887, 120 U.S. 506, 7 S.Ct. 648, 30 L.Ed. 707; Trask v. Hartford & N.H.R.R., 1861, 84 Mass. (2 Allen) 331. We believe, however, that in the course of trial the parties' stipulation as to the state executions effected an amendment of the pleadings under Rule 15(b), transforming the counterclaim into one on the state court judgment. George Cohen Sons & Co. v. Koch, 1 Cir., 1967, 376 F. 2d 629.[5] The propriety of the state judgment being undisputed, the counterclaim, as amended, must succeed.

5. We need not reach the question whether the counterclaim so amended became permissive rather than compulsory, for an independent basis of jurisdiction, Auto-

The judgments of the district court are vacated and the case is remanded to the district court for entry of judgment for the defendant on the complaint and for the plaintiff in counterclaim on the counterclaim.

graphic Register Co. v. Philip Hano Co., 1 Cir., 1952, 198 F.2d 208, exists in the diversity of the parties.