INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,

v.

S. S. FLYING TRADER, her engines, boilers, etc.

v.

AMERICAN EXPORT LINES, INC., Defendant.

No. 65 AD 388.

United States District Court
S. D. New York.

Nov. 21, 1969.

Poles, Tublin, Patestides & Stratakis, New York City, for plaintiff; Melvin J. Tublin, Patrick V. Martin, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; M. E. De-Orchis, LeRoy S. Corsa, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, as subrogee to the rights of the owners of the cargo, seeks to recover damages from the defendant on the ground that most of the cargo was lost while being carried on defendant's vessel. At the trial, plaintiff established that the cargo, consisting of 47 drums containing synthetic latex and 35 drums containing gasoline additive, was delivered aboard defendant's vessel, the S.S. FLYING TRADER, in Baltimore and New York, for shipment to Bombay, India; that defendant issued clean bills of lading for the cargo; and that, with the exception of 4 drums of the gasoline additive, the cargo did not reach its destination. Thus, the burden was on the defendant to prove that the loss was due to an excepted cause under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304, or that it exercised due diligence to avoid the loss. M. W. Zack Metal Co. v. S.S. Birmingham City, 311 F.2d 334 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir. 1962); Levatino Company v. M/S Helvig Torm, 295 F.Supp. 725 (S.D. N.Y.1968); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438 (S. D.N.Y.1948), mod. on other grounds, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

*Excepted Causes under COGSA*

Sections 4(2) (a) and (n) of COGSA, 46 U.S.C. § 1304(2) (a) and (n), provide:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

(n) Insufficiency of packing."

At Baltimore, the Firestone Tire & Rubber Company shipped 47 drums of synthetic latex to its affiliate in Bombay, India, the Firestone Tire and Rubber Company of India, Limited. On May 29, 1963, defendant issued its clean bill of lading. The 47 drums were stowed, one drum high, across the forward end of the upper 'tween deck of the No. 1 hold. The FLYING TRADER proceeded to Philadelphia and then to New York.

At New York, Esso International, Inc. shipped 35 drums of gasoline additive to its affiliate in Bombay, India, the Esso Standard Refining Company of India, Limited. On June 7, 1963, defendant issued its clean bill of lading for the shipment, which was loaded aboard the FLYING TRADER in the aft end of the lower 'tween deck of the No. 1 hold. Three large tanks were stowed forward of the drums, for discharge at Kandla, the port immediately before Bombay.

Additional cargo was stowed in the upper 'tween deck of the No. 1 hold: (1) 1664 bags of silicon for discharge at Alexandria, on top of the drums of latex; (2) general cargo for discharge at Genoa and Beirut, just aft of the drums of latex; (3) canned goods and boxed parts for discharge at Beirut, and additional bags of silicon for discharge at Alexandria, in the after end of the upper 'tween deck of the No. 1 hold.

The FLYING TRADER sailed from New York on June 8, 1963, calling at Barcelona, Genoa, Beirut and Alexandria. When she sailed from Alexandria, only the 47 drums of latex remained in the upper 'tween deck of the No. 1 hold, together with a shipment of 25 drums of "Plasticiser," loaded at Alexandria for discharge at Bombay.

The FLYING TRADER sailed from Alexandria on July 2, 1963. She went through 3 days of swells on July 8, 9, and 10, 1963, rolling continuously at angles of from 3 to 24 degrees. She arrived at Karachi Roadstead on July 11, and anchored at 0037 about 3 miles off the Manora Point Lighthouse, at a bearing of about 30 degrees, to await the pilot; while at anchor she was rolling up to 35 degrees in a deep swell.

At 0530 hours the pilot boat approached, and the vessel first took a position off Manora Point at a bearing of about 30 degrees to the Manora Point Lighthouse, so that the wind and the heavy southwesterly monsoon swells, which were reaching up to 20 feet, were on her port quarter. The pilot came alongside the starboard side, but could not board because of the heavy rolling the FLYING TRADER was undergoing, and he "ordered" Captain Mountain to change her position, so that the sea was to her stern. This position was also unsatisfactory to the pilot and he again "ordered" Captain Mountain to change position. The pilot then boarded the FLYING TRADER from her port bow, at 0614 hours. In this third position, the sea was to the starboard quarter of the FLYING TRADER, she was rolling up to 40 degrees, and she was in the trough of the sea.

Captain Mountain's deposition indicates that he had made 50 voyages to the Port of Karachi, and that the weather on this voyage was more severe than usual. He stated that a Victory ship such as the FLYING TRADER would roll heavily when the sea and wind are to her starboard quarter, which was her position when she picked up the pilot. When the vessel picked up the pilot, she was in the trough of the sea, that is, lying obliquely or at right angles to the sea, and he "wouldn't maneuver in this position, you know. This is my requirement to embark the pilot. Pilot's orders." Finally, he said that a British vessel about half a mile to the southeast of the FLYING TRADER had attempted to board a pilot, failed, and stood out to sea, heading her bow into the swells, to return when the seas abated.

After the pilot boarded, he told Captain Mountain that something was loose in the holds, as did the Chief Officer. The FLYING TRADER docked at Karachi at 0758.

The third mate, Lopez, who was on deck near the hold, testified that he heard no noise from the No. 1 hold and none was reported to him. Captain Voge, plaintiff's expert called on rebuttal, testified that if the drums had broken stow, the noise would have been audible on the deck.

After the FLYING TRADER was docked, the holds were examined for cargo damage, and a surveyor's report on defendant's behalf was made. The surveyor's report stated:

"The vessel anchored of [sic] the Port of Karachi on 11th July 1963 with a heavy swell running and winds of force 7 to 8. While awaiting Pilot the vessel rolled heavily, reaching 40°, resulting in certain cargo shifting although it was stowed in the normal manner.

1. FIRESTONE 47 Drums of Synthetic Latex
 BOMBAY

These drums were stowed in No. 1 Upper Tween Deck and secured. The lids were secured by clip rings and as the vessel rolled several lids were forced off and the partially empty drums crushed, thus slackening the stow and allowing the drums to fall into the lower hold. In our opinion this type of lid is not satisfactory for drums containing liquids.

2. B.C.F. Drums Plastic
 DIOCTYS
 DHTHALATE BOMBAY

These drums also broke stow and a number fell from upper Tween Deck into Lower Tween Deck crushing and denting the drums which are manifested as "Reused Drums."

The surveyor's report also lists some other damage, but does not mention the drums of gasoline additive. Captain Mountain's deposition indicates that the laborers refused to discharge the damaged cargo of synthetic latex and that it was difficult to restow it, because the latex and "chemicals" mixed and contaminated the cargo, and burned the stevedores' skin, and that the material which caused the burns was the gasoline additive. In his letter to his employer mailed from Karachi on July 13, 1963, however, he mentioned only the latex, and did not mention the burns or gasoline additive. In his letter of July 22, from Bombay, Captain Mountain referred again to the latex and the burns, and to the "irritating nature of the chemicals"; in his letter of July 26 from Bombay he stated that "gasoline additive" was salvaged (not "chemicals").

The FLYING TRADER left Karachi on July 15, 1963, at 0830, and arrived at Kandla at 1730 on the same day. At Kandla the three large tanks stowed in front of the gasoline additive were discharged. She then left Kandla on July 14, 1963, for Bombay, India; on the 18th there were swells and she rolled up to 22 degrees. She arrived at Bombay on July 18 at 2006 and docked the next morning. Further damage to the cargo was observed, and a surveyor's report of the damage was made at the request of the defendant, which stated that the damaged cargo included the "Plasticiser," the synthetic latex, the gasoline additive, and also 7 drums of "chemicals." The report stated:

"The above packages were crushed and charred due to a chemical reaction as a result of their coming in contact with chemicals, latex, etc., which had leaked from their containers also stowed in the same hatch. The above packages were observed to be completely damaged having no salvage value.

We are further informed that due to the nature of the above cargo of chemicals etc., causing irritation to the skin, the stevedore labour refused to handle this cargo and also the Bombay Port Trust authorities refused to accept delivery of such damaged cargo in their sheds.

We therefore recommend that the said cargo be jettisoned at sea on the vessel's departure from this port and an official entry to this effect be made in the vessel's official Log Book."

The cargo was jettisoned after the FLYING TRADER left Bombay, except for 4 undamaged drums of the gasoline additive which were delivered to the consignee.

*Negligent Navigation*

Vessels entering Karachi Harbor are governed by the "Sailing Directions, West Coast of India," which provide in relevant part:

"Vessels should not bring Manora Lighthouse to bear less than 030° and during the southwest monsoon or whenever strong westerly and southwesterly winds are prevalent should never approach within 2 miles of Manora Lighthouse, as otherwise, they may be in danger of coming under the influence of the heavy rollers and swell on the flats to the eastward. While awaiting the pilot they should heave to, head to wind and sea, and on the approach of

the pilot boat, turn so as to place the wind and sea on the port quarter, and remain thus, hove to, until the pilot has boarded."

Captain Reilly, defendant's expert witness, was of the opinion that Captain Mountain's handling of the FLYING TRADER as described at the trial was "very poor seamanship," because it would cause violent rolling. He measured the distance between the FLYING TRADER when she picked up the pilot and the Point Manora Lighthouse and found it to be 1½ miles, as indicated on the chart used by Captain Mountain to illustrate his deposition testimony; he testified that, according to the "Sailing Directions," a vessel should not approach Point Manora Lighthouse closer than 2 miles in heavy weather.

 Captain Mountain was negligent when he picked up the pilot at Karachi. In violation of the "Sailing Directions," during unusually rough weather in the monsoon season he maneuvered the FLYING TRADER so that the wind and sea were at her starboard quarter, allowed her to bear on the Point Manora Lighthouse less than 30 degrees, approached the Point Manora Lighthouse closer than 2 miles, allowing her to fall into the trough of the sea where she could be and was subjected to heavy rolling. The fact that Captain Mountain was following the pilot's "orders" does not affect this conclusion; as master, he had ultimate responsibility for the navigation of the ship—Captain Reilly testified that a pilot does not "order" a master to do something he should not do. In any event, the excepted cause provided in section 4(2) (a) of COGSA, *supra*, applies to the "Act, neglect, or default of the * * * *pilot*" (emphasis added) as well as that of the master.

*Insufficiency of Packing of the Synthetic Latex*

 Plaintiff's witness in rebuttal, Singer, supervisor of the claims division in Firestone's corporation transportation department, testified that in 1963 Firestone used in its export trade a 55 gallon drum of 16 gauge steel with two bung holes for loading and a welded top. The report of defendant's surveyor made at Karachi, and Captain Mountain's letter to defendant from Karachi, establish, however, that the tops of the drums of synthetic latex were secured by clip rings.

Sealing the drums with clip rings was insufficient packing because upon impact or pressure such as would be experienced when a vessel rolls, the rings may spring loose, causing the contents to spill out.

On the evidence, defendant has established "neglect . . . of the master," and, as to the 47 drums of synthetic latex, "Insufficiency of packing," COGSA § 4 (2) (a) and (n), *supra*. However, defendant must also prove that these factors caused the cargo loss.

*Causation*

*Latex*

 There was ample evidence to show that the disarray of the cargo as found at Karachi, and later at Bombay, was due to the spilling of the synthetic latex. The reports of the surveyors made at these ports, and Captain Mountain's deposition, make this clear. The spilling of the latex was due to the use of clip rings on the drums instead of using welded drums. The rough seas encountered during the voyage caused pressure on the drums as the vessel rolled, resulting in springing of the clip rings, and the spilling of the latex, with the loss of resistance of the drums and further spillage. The cumulative effect of these conditions was to destroy the entire cargo of 47 drums of synthetic latex. Therefore, plaintiff is not entitled to recover for the loss of the synthetic latex unless it has affirmatively established that defendant failed to use reasonable care in stowing the drums, and that defendant's failure was also a cause of the damage. Firestone Synthetic Fibers Co. v. M/S Black Heron, 324 F.2d 835 (2d Cir. 1963).

While there was evidence that surrounding cargo was discharged at ports prior to Karachi, and that the vessel's log did not record additional lashing of the drums after such discharge, on the entire

record the court does not find that plaintiff has established that defendant failed to use reasonable care.[1] Accordingly, the plaintiff is not entitled to recover for the loss of the drums of synthetic latex.[2]

### The Gasoline Additive

■ There is no evidence that the 35 drums containing gasoline additive were improperly packed, nor does the court find that the loss of the gasoline additive was due to Captain Mountain's negligent navigation at Karachi. The only evidence that the gasoline additive sustained damage at Karachi was Captain Mountain's deposition, taken in 1966, three years after the voyage and after this action was commenced, in which he states that the stevedores' feet were burned by a mixture of contaminants in the hold, and that the gasoline additive caused the burns. However, Captain Mountain did not mention the gasoline additive in his 1963 letter to defendant from Karachi, and the Karachi surveyor's report does not mention it. At Bombay, Captain Mountain described the "burning" substance as "chemicals."

The Bombay surveyor's report indicates that the gasoline additive was damaged on arrival at Bombay, but there was no evidence that any damage to the gasoline additive was observed when the vessel called at Kandla. Therefore, the damage appears to have been sustained between Kandla and Bombay, possibly as a result of the heavy rolling indicated in the ship's log. The burns described by Captain Mountain at Karachi may have been caused by some other substance, either the latex or the "Plasticiser." Defendant has not established that the loss of the gasoline additive was caused by Captain Mountain's negligent navigation at Karachi. Therefore, since the drums were shipped under clean bills of lading and 31 of them did not reach their destination, defendant is liable to plaintiff in damages for the lost drums.[3]

### Damages

The value of the 35 drums of gasoline additive, with freight, was $11,790.63, or $336.875 per drum. Since 31 drums were not delivered, plaintiff is entitled to damage of 31 x 336.875, or $10,443.12.

The foregoing constitutes the court's findings of fact and conclusions of law. F.R.Civ.P. 52(a).

The clerk may enter judgments (1) in favor of defendant dismissing the complaint insofar as it seeks damages for the loss of the 47 drums of synthetic latex; (2) in favor of plaintiff in the amount of $10,443.12 for the loss of 31 drums of gasoline additive, together with interest at the rate of 6% per annum from the date of entry.

It is so ordered.

1. Plaintiff's contention that the welding-over of the manhole to the hatch rendered the FLYING TRADER unseaworthy is without substance; even if it were not welded over, the master would not endanger his men by sending them into the hatch when the vessel was rolling as heavily as it was. At other times there was access to the hatch through the pontoon hatch cover.

2. It is therefore unnecessary to decide whether plaintiff's claim is also barred by reason of Captain Mountain's negligent maneuvering at Karachi.

3. Defendant at trial asserted for the first time a partial defense by which it sought to limit plaintiff's claim for the gasoline additive to $2,437.05. This defense was based upon defendant's reply to plaintiff's letter of June 24, 1964, claiming damages in that amount and seeking an extension of its time to file suit; the reply is a form letter dated July 6, 1964, which states:

"In consideration of our granting this extension and your acceptance of same, it is agreed that you do not increase, change, or alter the specific items as presently outlined, nor increase the amount as set forth in the claim originally filed with us, even though suit hereafter be brought. In addition, it is understood that our agreement to this extension places you in no better position than you would have been in if you had commenced suit today."

There were several subsequent extensions which contained no such limitation. In any event, defendant waived its partial defense, if it had one, by not raising it until the trial commenced. F.R.Civ.P. 8(c).