**Donald W. CLOSE and American Home Assurance Company, Plaintiffs,**

v.

**Vincent ANDERSON d/b/a Vince Anderson Barge Company, in personam, and the M/V J. S. POLHEMUS, her engines, tackle, apparel, furniture and equipment, and the BARGE MLC, in rem, Defendants and Third-Party Plaintiffs,**

v.

**BURGESS CONSTRUCTION COMPANY, Third-Party Defendant.**

No. C75–217B.

United States District Court, W. D. Washington, Seattle Division.

Oct. 11, 1977.

Allan L. MacDougall, Madden & Poliak, Seattle, Wash., for plaintiffs.

Martin P. Detels, Jr., Detels, Draper & Marinkovich, Seattle, Wash., for third party defendant.

Robert L. Brousseau, Walsh & Margolis, Seattle, Wash., for defendants and third party plaintiffs.

BEEKS, District Judge:

This is an action for damages suffered by plaintiff (Close) when two reels of armored cable were damaged during transport from Bellingham, Washington to a project on which Close was working in Snettisham, Alaska. The principal issue concerns the condition of the reels upon which the cable was wound at the time it was delivered to Anderson. The issue of damages has been bifurcated.

Close was a subcontractor on the Snettisham hydroelectric project during late 1973 and early 1974. In order to complete the job, it needed a quantity of three conductor armored cable to replace the original cable which the Corps of Engineers had rejected. This type of cable is manufactured by General Electric Company in Bridgeport, Connecticut by special order only. In this case, it took approximately one year from the time the order was placed by Close until it was delivered to G.E.'s warehouse in Tukwila, Washington.

G.E. was to transport the cable to Foss-Alaska, a water carrier, for transportation to Snettisham. However, Close determined that Foss would not transport the cable and it therefore searched to find another means of transport. Defendant Anderson Barge Company (Anderson) was suggested as a possible carrier by the general contractor of the Snettisham project. Upon inquiry it was ascertained that Anderson was under contract to carry heavy construction equipment to Wrangell and Juneau, Alaska for third party defendant, Burgess Construction Company (Burgess), aboard Anderson's barge, a flat open steel deck barge. Anderson orally agreed, however, to carry the two reels if there was room on his barge after the Burgess cargo was loaded. No bill of lading was issued.

The reels, constructed of wood with reinforced flanges, were delivered to Anderson in Bellingham, Washington in apparent good condition. The flanges were painted, the inside of each being white and the outside a blue gray. They were the only protection given the cable. A heavy paper covering wrapped around the cable itself between the flanges was intended as an indicator of cable damage. It facilitated exterior inspection; if the integrity of the paper was violated, cable damage was suspected. The reels were not enclosed by steel-banded wooden lagging (slats across the entire circumference of the reels which are affixed to the outer rims of the flanges and strengthened by exterior steel bands) or any other material which would serve to protect the cable from contact damage.

No loading instructions were given Anderson by Close or G.E.[1] The reels were stowed on the forward end of the barge near the bow, one on each side, after all of the Burgess equipment had been loaded. The initial loading was without incident and the tug and barge left Bellingham in early January, 1974. The reels were delivered at Snettisham on or about March 15, 1974 in a greatly damaged condition. The Corps of Engineers rejected the cable for use in the Snettisham project and it was subsequently sold for scrap.

█ The duty which Anderson owed to Close depends on whether it was a common or private carrier. I find the latter.

There exists some confusion as to what constitutes a common carrier. Many respected authorities declare that the test

---

1. At one time G.E. affixed written instructions to the reels themselves, but apparently abandoned the practice.

"appears to be whether the cargo is shipped by a single shipper or by two or more."[2] A close examination of the cases indicates that whether a carrier transports the cargo of more than one shipper on a particular voyage is merely one factor to be considered. In *Liverpool & G. W. Steam Co. v. Phenix Ins. Co.*[3] The MONTANA was a general ship carrying cargo and passengers on regular service between Liverpool and New York. In *THE NIAGARA v. Cordes*[4] the Court defined a common carrier as "one who undertakes for hire to transport the goods of those who may choose to employ him, from place to place. He is, in general, bound to take the goods of all who offer . . .."[5]

The primary characteristic of a common carrier is that he holds himself out to the public as one who is ready and willing to undertake the transportation of goods generally.[6] One instance of a private contract carrier transporting the cargo of two shippers does not, in and of itself, transform that carrier into a common carrier.[7]

Anderson usually chartered its barge to a single shipper and undertook to carry Close's cargo more or less as a favor to Close since Anderson was going to be within the vicinity of Snettisham while delivering Burgess' equipment. There is no evidence that Anderson held itself out as a common carrier, nor that its tug and barge constituted a general ship. Furthermore, Anderson had filed no tariff schedules as a common carrier. It also appears that Anderson could have legitimately refused to carry the reels. Accordingly, Anderson was not a common carrier.

■ "In private contracts of affreightment, the relationship between the parties is that of bailor-bailee . . .."[8] Thus Anderson was not an insurer of the cargo as is a common carrier, and owed Close only a duty of due care.[9]

■ Close correctly contends that it is entitled to a presumption of negligence since it delivered the reels to Anderson in apparent good condition and they were delivered by Anderson at destination in damaged condition.[10] However, Anderson has presented evidence sufficient to rebut the presumption. The cable was so insufficiently packaged for mid-winter transport by barge to Alaska that damage was inevitable.

According to G.E. and Close, reels of armored cable should be transported only in a vertical position to prevent the flanges from being broken due to the great weight of the cable. If reels are stowed in a horizontal position where the reel is resting flat on one flange, the weight of the cable will cause the flange to be pressed against the interior cable as the reel is lifted from a flat to a vertical position, thus frequently causing cable and flange damage.

**2.** A. Knauth, Ocean Bills of Lading 177 (4th ed. 1953); *see J. Gerber & Co., Inc. v. S. S. SABINE HOWALDT,* 310 F.Supp. 343, 350 (S.D.N.Y.1969) [citing *Liverpool & G. W. Steam Co. v. Phenix Ins. Co.,* 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889)], *rev'd on other grounds,* 437 F.2d 580 (2nd Cir. 1971); *see also* H. Longely, Common Carriage of Cargo 7–9 (1967).

**3.** *Liverpool & G. W. Steam Co. v. Phenix Ins. Co., supra* note 2, 129 U.S. at 437, 9 S.Ct. 469.

**4.** 62 U.S. 7, 21 How. 7, 16 L.Ed. 41 (1859).

**5.** *THE NIAGARA, supra,* 62 U.S. at 22.

**6.** *U. S. v. Stephen Brothers Line,* 384 F.2d 118 (5th Cir. 1967).

**7.** *Cf. Fall River Line Pier, Inc. v. International Trading Corp. of Virginia, Inc.,* 399 F.2d 413 (1st Cir. 1968) (reversing decision of the lower court which enforced order of Federal Maritime Commission and holding that the Commission, under 46 U.S.C. § 801, did not have jurisdiction over the pier company with respect to contract carriage merely because on a few occasions it had served common carriers).

**8.** *Pure Oil Co. v. M/V CARIBBEAN,* 235 F.Supp. 299, 304 (W.D.La.1964), *aff'd,* 370 F.2d 121 (5th Cir. 1966).

**9.** *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941); *Martin Marietta Corp. v. Peter Kiewit Sons' Co.,* 346 F.Supp. 892 (E.D.N.Y.1972), *aff'd,* 472 F.2d 1404 (2nd Cir. 1973).

**10.** *Commercial Molasses, supra,* 314 U.S. at 109–111, 62 S.Ct. 156, 86 L.Ed. at 94–96; *Martin Marietta, supra.*

Neither Anderson nor the Burgess employee in charge of loading the cable onto the barge in Bellingham had ever handled armored cable before. They were not aware of the properties of armored cable which, despite its name, is very delicate material. Close was well aware of the nature of the cargo but failed to inform Anderson or Burgess of it nor, as aforesaid, were they instructed as to the proper method of loading and stowing. It appears that substantial dents in the armor, any significant corrosion of the armor due to exposure to salt water or air, any significant damage to the reels, or any disruption of the paper lagging would have raised major questions as to the cable's ability to satisfy the specifications of the Corps of Engineers.

Without this specialized knowledge, horizontal stowage appeared to be the safest means of stowage. This would prevent the reels (which had a combined weight of over 25,000 pounds) from shifting or rolling during transport. Thus, the reels were stowed in a horizontal position by securing them to the deck by means of metal clips extended over the flanges and welded to the deck. No damage occurred when the reels were initially loaded.

The reels, however, and consequently the cable, sustained damage at Wrangell, Juneau, and Snettisham. The reels were initially and substantially damaged at Wrangell. They had to be moved from a horizontal to a vertical position in order that they could be shifted to allow Burgess to off-load some of its equipment. During this process the reels were damaged as they were being lifted by means of two steel lines attached to the ends of a steel rod placed through the center of each reel core. The rods pulled up through the reel cores and into the cable itself, causing extensive and substantial damage to the cable. (The armor on one reel was also dented when the loader backed into it, but it does not appear that this caused any significant damage).

The cable was subsequently damaged in Juneau when it was off-loaded and set on the ground to facilitate the unloading of Burgess' equipment. It was damaged further when the Corps of Engineers unloaded the cable in Snettisham. Because the cores had been crushed in Wrangell, slings were necessarily employed to lift the reels. The use of slings dented the armor and caused the cable to be squeezed. Also, the destruction of the cores caused the reels to "slump" which reduced the clearance between the cable and the end of the flanges. This contributed to the damage caused when the reels were unloaded onto the ground in Juneau and the armor was dented due to contact with the rough terrain covered with ice and snow.

I find that the primary cause of the cable damage was its insufficient and deceptive packaging. The evidence indicates and an examination of samples taken from at least one core demonstrates conclusively that the wood was completely consumed by dry-rot. These rotten reels afforded little protection to the cable. When the rods pulled up through the cores at Wrangell, each rod was suspending a weight of approximately six tons. Thus the rods were driven into the cable and damaged it to such an extent it was rendered useless except for junk. Accordingly, I need not consider liability for the subsequent damage which occurred at Juneau and at Snettisham. The question before me is thus reduced to which party is responsible for the damage which occurred at Wrangell.

Adequate packaging is the responsibility of the shipper.[11] The packaging must be sufficient to withstand normal and reasonably foreseeable events.[12]

I am convinced that steel-banded lagging should have been used for the protection of the armored cable during transportation of

11. *Eastern Motor Express v. Maschmeijer,* 247 F.2d 826 (2nd Cir. 1957), *cert. denied,* 355 U.S. 959, 78 S.Ct. 535, 2 L.Ed.2d 534 (1958).

12. *Ins. Co. of North America v. S. S. FLYING TRADER,* 306 F.Supp. 221, 225 (S.D.N.Y.1969)

(sealing drums of synthetic latex with clip rings rather than welded tops held to be insufficient packaging under COGSA because upon impact or pressure such as when a vessel rolls, the rings may spring loose).

the character here involved. Therefore, I find that the cable was not properly packaged for transport of this type. Had it been so packaged none of the damage would have occurred.

█ Close also argues that Anderson is liable under the doctrine of deviation for leaving his agreed geographic course when he by-passed Snettisham on the run from Wrangell to Juneau, and for reloading the reels aboard another barge in Juneau after Burgess' equipment had been off-loaded. It is clear that the doctrine of deviation applies to private as well as common carriers.[13]

█ I need not consider deviation. As I have found, the cable was rendered completely unusable at Wrangell—prior to any possible deviation. Where the deviation occurs subsequent to the damage the carrier is excused from the normal consequences of deviation.[14]

By way of summation, I find neither Anderson nor Burgess at fault. In my opinion, the sole proximate cause of the damage here involved was the insufficiency of the packaging. The complaint of the plaintiff is therefore dismissed as is any cause of action by plaintiff against Burgess under F.R.C.P. 14(c). Anderson shall recover its taxable costs from plaintiff. On the third party cause of action, each party shall bear its own costs.

This opinion shall constitute the court's findings of fact and conclusions of law under F.R.C.P. 52(a).

---

**13.** *THE HERMOSA,* 57 F.2d 20, 27 (9th Cir. 1932).

**14.** *Id.* at 26–27.