**HERCULES POWDER COMPANY, Plaintiff,**

v.

**COMMERCIAL TRANSPORT CORPORATION, a corporation, and BARGE CHEM VI, her tackle, etc., Defendants.**

**No. 67 C 204.**

United States District Court
N. D. Illinois, E. D.
July 13, 1967.

Clarence R. Conklin and Randall T. Clair, Heineke, Conklin & Schrader, Chicago, Ill., for plaintiff.

Stuart B. Bradley and Daniel K. Schlorf, Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for defendants.

## OPINION

WILL, District Judge.

Plaintiff brings this action to recover for cargo damage allegedly caused by the unseaworthiness of the Barge Chem VI, a tank barge. Plaintiff entered into a contract of charter with defendant Commercial Transport Corporation (Commercial) to carry a cargo of bulk turpentine aboard defendant's vessel, the Barge Chem VI. On December 11, 1962, 330,-308 gallons of turpentine were loaded on board the barge in the Port of Gulfport, Mississippi. After arrival at the Port of Chicago, plaintiff alleges that it was discovered that 33,779 gallons of turpentine had leaked from the tanks into the bilges and rakes of the barge resulting in the contamination of 24,577 gallons with water and molasses and the loss of 9,203 gallons.

In their answer, defendants have asserted certain provisions of the contract of charter which are in the nature of affirmative defenses to the action. Plaintiff has moved to strike these defenses.

Four provisions of the contract comprise the asserted affirmative defenses.

They may be properly placed into two categories: (a) paragraphs twelve and sixteen relating to the cleaning of the barge, and (b) paragraphs seventeen and twenty which cover insurance and release from liability.

Paragraphs Twelve and Sixteen

Paragraph twelve of the contract entitled "SPECIAL PROVISIONS" reads as follows:

Carrier will clean barge for its account at Avondale Marine Ways, New Orleans, Louisiana, subject to inspection and acceptance by A. M. Judge & Company as suitable for the intended cargo. Acceptance by Shipper's inspector will constitute full performance by Carrier of its responsibility.

Paragraph sixteen which is entitled "CLEANING" reads as follows:

Carrier shall tender barges as stated on the face hereof; if further cleaning is required the cost shall be for Charterer's account and time so used shall count as used lay time. Loading of the barges shall constitute Charterer's acceptance of the suitability of the barges for the intended cargo.

■ Defendants contend that the language of the two provisions are in effect a waiver of a warranty of seaworthiness by plaintiff. Primary reliance is placed upon the language of paragraph sixteen wherein it reads that loading constitutes plaintiff's "acceptance of the suitability of the barge for the intended cargo." By itself, that language would tend to support defendants' position, but read in context of the provision entitled "Cleaning" and where all other language in the paragraph relates to cleaning, it is obvious that the purpose of the clause is to relieve the carrier from responsibility for damage to the cargo which is the result of unclean tanks after the shipper has inspected the tanks and loaded the cargo. Similarly, paragraph twelve obligates the carrier to clean the barge, subject to "acceptance by Shipper's inspector." The complaint alleges that the tanks leaked, the damage to the cargo being the result of this factor, not unclean or contaminated tanks.

■ On their face, these two provisions of the contract are susceptible of a single interpretation, namely, that they are restricted to the subject of cleaning the barge. Nothing in the contract even hints of a contrary conclusion. There being no allegation in the complaint pertaining to damage caused by unclean conditions, paragraphs twelve and sixteen of the contract and all references thereto should be stricken from the answer.

Paragraphs Seventeen and Twenty

In asserting these two paragraphs, defendants have raised the more difficult questions of whether plaintiffs have breached the contract and therefore cannot claim damages caused by alleged unseaworthiness and/or whether the contract provisions release defendant from liability for cargo damage. The relevant provisions read as follows: Paragraph seventeen entitled "INSURANCE":

Carrier's equipment used hereunder shall be covered by Hull and P & I Insurance or equivalent at Carrier's expense. *Cargo carried hereunder shall be insured under usual bulk oil clauses by Charterer at Charterer's expense and Carrier shall be named as co-assured in said policies.* (emphasis added)

Paragraph twenty entitled "RELEASE":

This Charter shall be deemed and construed as private carriage and not common carriage by Carrier; the products transported hereunder shall be in Carrier's custody from the time such products pass through Carrier's barge intake connection at loading terminal and until the time such products pass through Carrier's barge discharging connection at unloading terminal. The cargo shall be transported at the sole risk of such cargo, insofar as loss of or damage to such cargo is concerned, and neither Carrier nor any person employed by Carrier, nor any vessel, barge or other equipment used, owned

or chartered by the Carrier whether used hereunder or not shall be liable for any loss of or damage to such cargo regardless of the cause of such loss or damage unless: (a) Such loss or damage is caused by unseaworthiness and with respect to such unseaworthiness Carrier shall have failed to exercise due diligence to make such tow and other equipment seaworthy, properly manned, equipped and supplied; or (b) Such loss or damage is caused by the failure of Carrier to exercise reasonable care in the receipt, stowage, custody, or delivery of the cargo distinguished from the management or navigation of the vessel. *Carrier shall have the benefit of any cargo insurance carried by shipper on the products transported hereunder whether named as co-assured or not.* Nothing in this contract shall be construed to deprive Carrier of, or to limit Carrier's rights to, any statutory protection or limitation of liability, which would otherwise be applicable. No liability whatsoever shall exist for any loss or shortage unless such loss or shortage is in excess of one per cent (1%) as determined by barge ullages before and after loading and unloading; and in no case shall Carrier be liable for an amount exceeding $250 per ton or prorata in case of partial loss or damage. (emphasis added)

Plaintiff initially sought to have these defenses stricken on the ground that the benefit of insurance provision contained in paragraph twenty is rendered inapplicable by a loan arrangement entered into between plaintiff and its insurer. It now appears, and plaintiff apparently concedes, that defendants are relying on clause seventeen which obligates plaintiff to insure the cargo and name Commercial Transport as co-assured on the policy, for the proposition that failure to perform this obligation places plaintiff in default.

Benefit of insurance clauses were early upheld by the courts, Phoenix Insurance Co. v. Erie and Western Transport Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873 (1886), which resulted in exculpating the carrier for liability when the shipper was reimbursed by cargo insurance. By "loading" the amount of coverage to the shipper, however, the insurance companies who are, of course, subrogated to shippers for claims paid, successfully devised around these clauses. Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918). See Gilmore and Black, The Law of Admiralty, § 3–47 (1957). But the Supreme Court in *Luckenbach* recognized that the shipper was under no obligation to take out insurance on the cargo, 248 U.S. at 148, 39 S.Ct. 53.

In this connection, it should also be noted that Section 1 of the Harter Act, 46 U.S.C. § 190, voids clauses in bills of lading or shipping receipts which have the effect of limiting the liability of the carrier for loss or damage to cargo arising from fault of the carrier.

That provision, however, does not cover private contracts of affreightment such as the one at issue in the instant case. Private carriers are exempt from the purview of the Harter Act limitation of liability provisions, Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 89 F.2d 865 (2 Cir. 1937), cert. den. 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545 (1937); The Elizabeth Edwards, 27 F.2d 747 (2 Cir. 1928); Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813, 818 (7 Cir. 1967). Professors Gilmore and Black relate that "Charter party carriage, moreover, is looked on as a 'private' carriage, and, as pointed out above, there are no statutory rules forbidding the adjustment of risk for goods damaged in any manner provided by the charter." Gilmore and Black, supra, §§ 4–5.

The question presented here, therefore, is whether, in this contract of private carriage, the parties effectively exculpated the carrier from liability for cargo damage and, if so, whether the courts will enforce such an agreement.

The most recent case in which a private carrier contract was construed (al-

though the contract has important differences from that involved herein) is Pure Oil Co. v. M/V Caribbean, 235 F.Supp. 299 (W.D.La.1964), aff'd. Pure Oil Co. v. Boyne, 370 F.2d 121 (5 Cir. 1966). Pure Oil contracted with Silvey-Taylor Barge Co. whereby Silvey-Taylor was to provide barges for the shipment of Pure's cargo. In the contract Silvey-Taylor agreed to carry Hull and P & I Insurance. Pure Oil acknowledged in the contract that the towage rate did not contemplate or include an allowance for liability insurance covering the cargo. Pure Oil further agreed to hold Silvey-Taylor and its tow, harmless for claims for cargo loss and to insure its cargo to the full value and secure a waiver of assignment and/or subrogation from the cargo underwriters in favor of Silvey-Taylor on account of any cargo claim paid by the underwriters.

Silvey-Taylor then contracted with Brent Towing whereby Brent agreed to furnish towage to the barge carrying the Pure Oil cargo. In the Silvey-Taylor-Brent contract a provision was included which stated that "shipper will provide all cargo insurance and that neither the Charterer (Silvey-Taylor) nor the tower will be responsible for any loss or damage to the cargo."

After a river collision between the Brent towed Silvey-Taylor barge carrying the Pure Oil cargo and the tow of the M/V Caribbean, a tug owned by the Caribbean Towing Company, Pure Oil brought an action against the tug Caribbean and Caribbean Towing for damage to its cargo. (Pure had already recovered from its insurer and, perhaps because of the contract provisions in the charter agreement, chose not to bring an action against Silvey-Taylor or Brent. While it is speculation, it is possible that Pure Oil brought the action for the benefit of its insurer.) Caribbean in turn brought an action against Brent and Silvey-Taylor. As a defense to the later action, Brent contended that it could not be held liable for damage to the cargo because of the provisions in the contract between Pure Oil and Silvey-Taylor and those in its contract with Silvey-Taylor.

One of the issues presented in *Pure Oil* was whether the rule of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), to wit: that a towboat owner may not validly contract against all liability for his own negligent tow, applied to that case. The court concluded that the tug and barges constituted one vessel. Brent, therefore, stood in the shoes of Silvey-Taylor, and as such was entitled to claim benefit of the contract for cargo loss or damage. *Bisso* was held inapplicable since the interest of Brent was identified with that of Silvey-Taylor "and the relationship of separate interests between Tug and Tow, found to exist in the *Bisso* and Winding Gulf [Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933] cases, supra, is not present here." 235 F.Supp. at page 305.

Notwithstanding the finding of inapplicability, the court proceeded to determine the question of whether to invalidate the contract provisions limiting liability in the same manner as the Supreme Court had determined that issue in *Bisso*—it viewed the contracts from a public policy perspective. The Court concluded that public policy did not require voidance of the contract limitations since there was an explicit statement that the contract rate included consideration of the insurance factor.

"Under circumstances such as we find here, where the parties contracted freely, at a fair rate which expressly takes into consideration economic factors bearing upon the services performed, public policy does not require that the provisions of this contract be stricken." 235 F.Supp. at page 305

The court found that both tows were at fault, and thus cargo damage was properly divided between Brent and Caribbean Towing. Brent, because of the contract limitation to which it was entitled, was relieved of its one-half share of the judgment.

Although the posture of the parties in *Pure Oil* does not place that decision on all fours with the instant case, it is perfectly clear that the crucial question there involved was the validity of the contract limitation. Whether the limitation here is also valid, however, requires an independent inquiry as to the language of the contract and the factors which were considered in arriving at the contract rate.

In T. M. No. 73, 1939 A.M.C. 673 (S.D.N.Y.1939), aff'd on other grounds, Commercial Molasses Corp. v. New York Tank Barge, Corp., 114 F.2d 248 (2 Cir. 1940), aff'd 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941), the issue of failure to fulfill a contract obligation of insurance coverage was presented in much the same context as in the instant case. In the district court, it was held that the cause of the accident being in doubt, the barge company was liable for damages because of a "presumption" of unseaworthiness arising from the fact that the barge sank without adequate explanation. However, because the contract contained a provision that the shipper "shall insure the cargo" carried by the barge company and that "neither the New York Tank Barge Co. nor such barges shall be liable for loss in respect of which insurance has been or could have been effected," the court concluded that failure of the shipper to perform the obligation of purchasing insurance relieved the barge company of the covenant of seaworthiness and its liability for damages. The shipper appealed the dismissal of the claim.

On appeal, the court rejected the "presumption" of unseaworthiness theory and concluded that the shipper failed to meet its burden of proving unseaworthiness on the party of the carrier. There was no need, therefore, the court noted, to consider the question upon which the district court had rested its decision. The decision was affirmed.

As noted above, Bisso v. Inland Waterways, supra, held invalid, for reasons of public policy, clauses in contracts of towage relieving the tower from liability for its negligence. In stating the rationale for its decision, the Court noted 349 U.S. at pages 90–91, 75 S.Ct. at pages 632–633 that:

"(T)his rule is merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees, employers and employees, public service companies and their customers. The two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." (footnotes omitted)

For a more detailed analysis of the policy considerations see Willis, The Right of Bailees to Contract Against Liability for Negligence, 20 Harv.L.Rev. 297 (1907).

■ Defendant attempts to limit applicability of *Bisso* to towage contracts, but adoption of defendant's construction ignores both the language in *Bisso* and the analysis in *Pure Oil*, supra. The policy considerations such as discouraging negligence and protecting buyers from sellers of goods or services who have power to dictate the terms of the agreement are as valid today as they were when *Bisso* was decided and are properly applied to all categories to which the court therein referred. In viewing provisions which would limit liability, courts are duty bound to evaluate the contract in the context of these policy considerations. Application of the *Bisso* rule, therefore, depends on the individual contract, the factors which went into its making, the relative economic positions of the parties, and the general nature of the industry.

■ In summary then, while parties to private contracts who are in a bailor-bailee relationship are free to contract and are not prevented by statute from

limiting liability, the courts will carefully examine the contractual milieu in determining the validity of these contract provisions.

 On the basis of the foregoing, we conclude that the motion to strike is premature. We do not have the necessary information to decide the question of limitation of liability in this case at this time. Numerous questions must be answered prior to such a determination. What is the proper interpretation of paragraphs seventeen and twenty read together? Was it the intention of the parties to limit liability? If so, under what economic conditions was this decision reached? Is it common practice to include these provisions in private charter contracts? If so, what are the public policy implications?

In accordance with the foregoing, the motion to strike from the answer reference to paragraphs twelve and sixteen of the charter contract is granted. As to paragraphs seventeen and twenty and all references to them, the motion is denied. An appropriate order will enter.