**CARIBE TUGBOAT CORPORATION, a corporation, Plaintiff,**

v.

**J. D. BARTER CONSTRUCTION COMPANY, INC., et al., Defendants.**

No. 78–208–Civ–J–B.

United States District Court,
M. D. Florida,
Jacksonville Division.

Jan. 29, 1981.

Robert E. Warren, Jacksonville, Fla., for plaintiff.

Harry W. Lawrence, Orlando, Fla., for defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SUSAN H. BLACK, District Judge.

This cause came on for trial before the Court on October 22 and 23, 1980, on plaintiff's claim for ocean freight charges due and owing, and defendants' counterclaim for consequential damages, under a private contract of affreightment entered into on February 11, 1977, for carriage of defendants' construction equipment from Jacksonville, Florida to Haiti.

Plaintiff sues under the contract for $115,000 in freight earned for the fourth of four voyages undertaken on defendants' behalf, as well as for $5,702.68 in discharging expenses paid by plaintiff during all four of the Jacksonville-Haiti trips. Defendants allege failure of consideration and ambiguity of the contract. They also interpose a set-off for cargo damage allegedly caused by plaintiff's negligence and counter-claim for more than $400,000 in consequential damages for alleged late delivery. To plaintiff's claim that exculpatory clauses in the contract relieve plaintiff of liability for cargo damage, defendants assert that the

clauses are unenforceable as contrary to public policy.

After hearing argument on plaintiff's Motion to Dismiss or Strike the Counterclaim, the Court determined on December 21, 1979, that it lacked an adequate factual basis to rule on the enforceability of the exculpatory clauses.

On October 14, 1980, the Court ordered bifurcation of the trial in this action. The first part of the proceedings would determine plaintiff's right to recover under the contract and develop a factual context in which to evaluate the exculpatory clauses. Specifically, the Court was asked to decide whether the clauses barred defendants' claims entirely, were wholly unenforceable, or had the intermediate effect of insulating plaintiff from liability for simple negligence, gross negligence and/or intentional acts.

The question of defendants' damages, if any, and their cause and extent were left for future determination. For purposes of this trial only, however, the Court is asked to assume that defendants' damages and the nature of the acts complained of by defendants consist of the following:

a. A truckload of the defendants' tools, worth about $6,000, was stolen while in the plaintiff's exclusive possession;

b. One or more mobile homes being shipped by defendants were damaged during loading or unloading or during transit;

c. The loading and stowage of the cargo was not in conformity with recognized standards, customs and trade usages in the ocean carriage trade;

d. Plaintiffs failed to use oil, grease, cosmolene, tarps or other manner of covering to protect defendants' cargo against salt spray or other elements of the sea;

e. Cargo loading was so reckless that a truck fender was ripped off during loading; plaintiff's employees caused tires to be blown out on other pieces of equipment; and pickup truck chassis were bent by barrels rolling across the barge;

f. Damage occurred during off-loading, including at least one instance of a vehicle running off the discharge ramp into the ocean;

g. Equipment damage due to salt spray resulted in late commencement of defendants' construction work in Haiti, causing defendants to suffer consequential damages;

h. More than $32,000 worth of damage to defendants' cargo occurred due to barge collision at sea, while the cargo was in plaintiff's exclusive possession.

Moreover, although the parties agreed that the barge used to transport defendants' equipment to Haiti was seaworthy at the start of each voyage, questions about the conduct of each voyage, the appropriateness of the barge for the carriage involved, and any later unseaworthiness due to improper stowage or other causes, were all reserved for later trial.

On other matters tried at this time the parties have no dispute. Plaintiff has performed according to the terms of the contract, in that it completed four voyages from Jacksonville to Haiti and delivered defendants' equipment to its destination. The dates of performance are not in question. Cargo for the first voyage was loaded aboard the barge and the voyage commenced on or about March 1, 1977. The barge returned to Jacksonville on or about March 20; loading for the second voyage was complete, and the barge departed, on or about March 23. Freight charges for the first voyage, in the amount of $100,000, were paid on or about March 28. The barge returned to Jacksonville on or about April 6; loading for the third voyage was complete, and the barge departed, on or about April 8. Freight charges for the second voyage, in the amount of $100,000, were paid on or about April 11. The barge returned to Jacksonville on or about April 30; loading for the fourth voyage was complete, and the barge departed, on or about May 9, with subsequent arrival in Haiti. Although freight charges for the third voyage, in the amount of $100,000, were paid on or about May 16, 1977, freight charges in the amount of $115,000 for the fourth voyage have not

been paid. They, along with incidental charges for cargo discharge, are the subject of this litigation.

## FINDINGS OF FACT

1. Plaintiff, Caribe Tugboat Corporation (hereinafter "Caribe"), is a corporation engaged in ocean transportation, including cargo transport using ocean-going tugs and barges. Caribe is a wholly-owned subsidiary of Crowley Maritime Corp., a worldwide marine transportation corporation with home offices in San Francisco, California. At all times material to this litigation, Caribe performed private contract carriage work for Crowley.

2. Defendants, J. D. Barter Construction Co., Inc., and Sangamo Construction Co., are Illinois road construction and earth-moving companies located in Harrisburg and Springfield, Illinois, respectively. Defendant, Sangamo-Barter Construction Co. International (hereinafter "Sangamo-Barter"), is a joint venture of these two companies, formed for the purpose of bidding on and performing a highway-construction contract in Haiti, with offices in Springfield, Illinois.

3. On or about December 16, 1976, Sangamo-Barter entered into a seventeen-million dollar highway-construction contract with the government of Haiti. The contract ostensibly called for the movement of heavy construction equipment into Haiti by mid-May, 1977, with construction of certain structures and abutments to be completed by early June.

4. Sangamo-Barter representatives contacted a number of ocean carriage companies during the first weeks of 1977, but apparently received responses from only three companies, including Caribe. Of those three, one was unsuitable since it did not use U.S.-flag vessels as required by the terms of the Export-Import Bank loan agreement with Haiti financing the highway construction.

5. After working out a bid, Caribe's representative, Mr. John Ducich, contacted Mr. Steve Wilson, Caribe's Director of Contract Services in San Francisco, on February 7, 1977. Mr. Wilson noted the particulars and contacted Mr. Dennis Kelly, a private attorney, with instructions to draft a contract of carriage incorporating Caribe's bid. Mr. Kelly is a specialist in maritime law, with about ten years' experience in the drafting of private carriage contracts and other aspects of tanker, tug and towage engagements. Mr. Kelly's initial proposal was typed in contract form and forwarded to Mr. Ducich in Jacksonville.

6. On or about February 10, 1977, Mr. Ducich went to Springfield with Mr. Kelly's draft contract in hand. There he met with Mr. H. H. Barter, president of J. D. Barter Construction Co., and Mr. Allan Reyhan, chief executive officer of Sangamo Construction Co., to discuss the "commercial" aspects of Caribe's draft contract bid. According to Mr. Ducich, he had no authority to negotiate "legal" aspects of the contract, including a number of risk-allocation and liability clauses common to ocean-carriage contracts. When the parties reached an impasse on several of these clauses, Mr. John Chapin, a Springfield attorney, was contacted by Messrs. Barter and Reyhan. Mr. Chapin has practiced corporate and real estate law since 1946, but by his own testimony has had no experience in the maritime field before or since the instant transaction.

7. Mr. Ducich proceeded to Mr. Chapin's office after the latter was contacted. There, with the draft contract exhibited and in Mr. Ducich's presence, a long-distance telephone call was placed to Mr. Kelly in San Francisco. The parties disagree sharply about what transpired at this point. Mr. Chapin testified that the call was of short duration, recalling that Mr. Kelly only discussed two of the clauses (the both-to-blame and general average provisions) peculiar to maritime contracts. The Court notes Mr. Barter's testimony, however, to the effect that Mr. Chapin was asked to review the draft contract "top to bottom," with attention to at least six clauses of special concern. Mr. Kelly produced time-sheets from the day in question to indicate that the phone conversation lasted approxi-

mately one and one-half hours. Moreover, Mr. Kelly's hand-written notes on his copy of the draft contract and Mr. Chapin's own annotations are strikingly similar, so much so that the possibility of later annotation by Mr. Chapin is remote. The Court credits Mr. Kelly's assertion that he explained the contract paragraph by paragraph after learning that Mr. Chapin was not a maritime attorney. The Court heard Mr. Kelly's explanation of the contract under oath and finds it clear and comprehensible. (Apparently Mr. Chapin did, too, since there is in evidence a letter from Mr. Chapin to Mr. Kelly thanking him for "your patience in explaining the ramifications of the Maritime [insurance] policy last week on the telephone." Pl. Ex. 10.)

8. Following the call, Mr. Chapin and Mr. Ducich returned to defendants' offices and continued to negotiate. A second draft of the contract was typed at Mr. Chapin's office and was proposed for execution the next day. Due to inadvertent errors, however, a third corrected draft was typed by Mr. Reyhan's secretary. On February 11, 1977, the parties executed this third draft by initialling each page and placing their signatures on the final page.

9. On February 10, Mr. Kelly arranged for verification of the insurance contemplated by the contract. A copy of the policy and the verification was forwarded by Mr. Kelly to Mr. Chapin, who reviewed it and forwarded it to Mr. Reyhan on February 18.

10. Messrs. Barter and Reyhan are experienced contractors. Mr. Barter's company was, in 1977, the largest dirt mover in Illinois, doing seven million dollars' worth of business in 1976. Mr. Barter also owned a 356-acre working farm, a 50% interest in a quarry and a 35% interest in the Bank of Harrisburg. Mr. Reyhan likewise had extensive experience in heavy construction work. Despite any unfamiliarity with the intricacies of maritime law, it is unrealistic to suggest that they lacked experience in negotiating the risks of equipment damage or on-site performance delays. Moreover, there was give-and-take in the negotiating process. Although defendants argue that Mr. Ducich refused to discuss the wording of a number of clauses crucial to this litigation (including the clause allocating risk of cargo damage to the shipper), hand-written changes on the draft contracts in evidence establish modification or concession by plaintiff on a number of points, including responsibility for cargo off-loading in Haiti and plaintiff's agreement to procure all-risk marine insurance on defendants' behalf.

11. The Court finds that Mr. Ducich made no guarantee of delivery of the cargo to Haiti within any particular time frame. The contract itself is silent on the question. The Court deems this silence intentional, noting Mr. Chapin's testimony that Mr. Ducich persistently refused to include any time for performance in the contract. Moreover, the Court finds defendants' evidence inconclusive on the question of whether Mr. Ducich knew of defendants' time constraints for the Haiti construction job when the carriage contract was negotiated. Mr. Chapin testified that defendants never informed Mr. Ducich of their belief that February 11 was the last day on which a carriage contract could be executed to leave sufficient time for performance under the terms of the Haiti deal. Although defendants claim Mr. Ducich knew when the equipment had to be in Haiti, they evidently feared informing him of the full extent of the time pressure they faced, lest he gain a bargaining advantage in the contract negotiations. But if they were less than fully candid with him then, the assertion that any delivery "guarantee" was made with full knowledge of defendants' time contraints—including possible consequences for delay—is not fully credible. Defendants' claim that they showed Mr. Ducich a copy of the Haiti contract when negotiating cargo delivery is weakened by lack of clear evidence that the Haiti contract even existed in English translation when Mr. Ducich was in Springfield. The Court notes, too, the lack of any evidence of a written complaint or protest by defendants during the course of any of the four voyages that performance was late. As noted above, freight for the first three voyages was paid

promptly, despite defendants' present contention that Caribe disregarded an alleged oral "side deal" made by Mr. Ducich promising delivery within 45 days.

12. The Court finds that defendants were fully apprised of the relationship between the liability-allocation provisions of the contract and the terms of the all-risk insurance policy procured by plaintiff on defendants' behalf. Specifically, the Court finds that defendants, through their attorney, Mr. Chapin, understood the all-risk policy to provide coverage for each voyage to Haiti in the amount of $1,500,000 ($6,000,000 total) against all damage to defendants' cargo, however caused, limited only by a deductible of $25,000 per voyage. From the evidence it appears that plaintiff fulfilled its obligation under the contract to obtain such all-risk coverage naming defendants as insureds. The Court credits Mr. Kelly's testimony that the exclusions under such an all-risk policy—especially the exclusion for damages caused by delay in transport—were explained to defendants at the time the contract was negotiated.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject-matter of this action pursuant to 28 U.S.C. § 1333 and Rule 9(h), F.R.Civ.P.

2. On December 21, 1979, the Court denied plaintiff's Motion to Dismiss and/or Strike defendant's Counterclaim, holding that the exculpatory clauses in the contract in this case, purporting to limit plaintiff's liability for cargo damage and delay, must be evaluated in light of "the individual contract, the factors which went into its making, the relative economic positions of the parties, and the general nature of the industry." *Hercules Powder Co. v. Commercial Transport Corp.*, 270 F.Supp. 676, 681 (N.D.Ill.1967).

3. In pertinent part, the contract sets forth the following scheme. In paragraph 1, the carrier (plaintiff) agrees to load, stow, transport and discharge one barge load of defendants' cargo on each of four consecutive voyages from Jacksonville to Haiti. The first voyage was to commence on or about March 1, 1977. As noted above, the contract is silent as to time of performance, either as to length of time for each voyage, completion date of all four voyages or any indication that time is to be of the essence. Defendants' contention to the contrary in paragraph 24 of Count IV of its Counterclaim is supportable only by the admission of parol evidence.

Paragraph 2 specifies the barge ST. KITTS as the barge to be used in carriage and describes the tandem tow and routing for the voyages. Carrier undertakes to use due diligence to tender the tug and barge in seaworthy condition at the start of each voyage. Carrier otherwise disclaims all warranties, including any warranty of seaworthiness or workmanlike service.

Paragraph 4 obligates carrier to load, stow, trim and secure the cargo on deck at carrier's expense at the place of loading. Carrier is to ground the barge at a discharging site selected by carrier "whereupon carrier shall unload the cargo at its risk and expense."

Paragraph 5 allocates the general risk of loss or damage to ship and cargo between the parties. Paragraph 5(a) places on defendants "all risk of loss, damage, misdelivery, delay, and expense to or in connection with the cargo and the loading, stowage, transportation and discharge thereof" not covered by insurance pursuant to paragraph 12 of the contract. Paragraph 5(b) places the corollary risk of loss, damage or expense to the vessels, whether or not caused by shipper's negligence, on the carrier. But neither the carrier nor its vessels are to be held liable for any loss to cargo, whether resulting from carrier's negligence, unseaworthiness, deviation or otherwise.[1]

---

1. Paragraph 5 of the Contract of Private Carriage reads as follows:

   5. *LIABILITY.*

    (a) *Cargo.* Shipper, on its own behalf and on behalf of the Consignee and owner of the cargo, assumes all risk of loss, damage, misdelivery, delay, and expense to or in connection with the cargo and the loading, stowage, transportation and discharge thereof which is not covered by the insurance provided pursu-

In paragraph 12, carrier obligates itself to procure and maintain at its cost and expense an all-risk policy of cargo insurance on behalf of the shipper with a deductible of $25,000 per voyage pursuant to the terms of paragraph 5(a).[2]

In paragraph 14, shipper agrees to furnish unloading personnel to carrier in Haiti for the discharge of the vessel. Shipper agrees to reimburse carrier for its costs of employing that personnel, plus fifteen per cent.

Paragraph 17 is an integration clause. It declares that the contract represents the final and complete agreement between the parties and that all prior written or oral agreements are to be superseded and fully integrated into the written contract.

■ Defendants claim the contractual obligations set forth are fatally inconsistent in at least two regards: first, with respect to the "load, stow, transport and discharge" provision of paragraph 1 as compared to the "load, stow, trim and secure" language of paragraph 4; and more importantly, insofar as the carrier agrees in paragraph 4 to unload the cargo "at its risk and expense" while purporting to disclaim all risk of loss to cargo, including loss on discharge, in paragraph 5.

The first contention is without merit. The parties negotiated the wording of paragraph 1 between themselves at Springfield.

From the testimony it appears that the language was placed in the contract at defendants' insistence. Its significance in altering any rights or obligations under the contract is not apparent to the Court.

■ The risk allocation is another matter. At trial, Mr. Kelly testified that the word "risk" was included in paragraph 4 only by mistake. Evidently, the first draft of the contract required the shipper (defendants) to choose a discharge site for the cargo and to effect the discharging. During negotiations at Springfield, defendants pointed out their lack of experience in maritime matters, and plaintiffs agreed to undertake responsibility for discharging if defendant provided the labor. In the course of rewriting the clause to shift discharge obligations from shipper to carrier, however, the word "risk" was included where "cost" had been intended. Draft versions of the contract in evidence reveal such heavy pencilled annotation as to make the oversight of a single word understandable.

This single word does not change the substance of the parties' agreement. The Court has found that defendants understood Mr. Kelly's explanation of the all-risk cargo insurance obtained for them by plaintiff at plaintiff's expense, according to the terms of the policy. Specifically, the Court believes that defendants understood their

---

ant to paragraph 12, and neither Carrier, the Barge, nor any vessel used in the transportation (including any towing vessel) nor the *owners or operators thereof shall be liable therefor whether resulting from negligence of Carrier, unseaworthiness, deviation or otherwise.*

(b) *Vessels.* Carrier, on its own behalf and on behalf of the owners and charterers of the tug and barge, assumes all risk of loss, damage and expense thereto and neither Shipper nor the owner or consignee of the cargo shall be liable therefor whether resulting from negligence of Shipper, unseaworthiness, deviation or otherwise, except that Shipper shall be liable for damage to the tug and/or barge occurring by reason of a general average act for which Carrier is entitled to contribution pursuant to paragraph 6.

2. Paragraph 12 of the Contract of Private Carriage reads as follows:

12. *INSURANCE.* During the entire time of performance hereunder Carrier shall procure and maintain at its sole cost and expense all risk coverage (excluding war risks) on the cargo and earned freight with a deductible of $25,000.00 per voyage equal to the full sound value of the cargo at destination with a limit of $6,000,000.00 total of all four voyages. Said insurance shall attach for each voyage when the cargo is delivered to Carrier at the loading port and shall remain in force thereafter until the cargo is unloaded at destination. Shipper shall advise Carrier of the value of each barge load of cargo prior to loading of each voyage. The deductible shall be for the account of Shipper pursuant to paragraph 5(a).

risk to be limited to the first $25,000 of cargo damage per voyage, however caused. The Court also notes Mr. Kelly's testimony that cargo insurance with a lower deductible was available, had defendants sought it. Most importantly, defendants do not limit their claims to discharge and unloading damage, whatever plausibility such a limited claim might have in light of paragraphs 4 and 5 taken together. Rather, they attack the entire risk-allocation scheme here, despite extensive evidence that the relationship of the general liability clause (paragraph 5) and the insurance clause (paragraph 12) was the subject of protracted negotiation and modification. It is important to note that the scheme included plaintiff's corollary assumption of the risk of barge damage, however caused, in paragraph 5(b). Since it was defendants' men who were to unload the barge by the terms of paragraph 14, this risk cannot be deemed insubstantial. Barge damage from beaching operations was not only foreseeable but expected, yet plaintiff assumed the risk and expense of these repairs, too. To allow plaintiff's paragraph 4 drafting error to undo the entire scheme of risk-allocation-plus-insurance would be to rewrite the parties' agreement. In its essentials this contractual scheme is unambiguous. The Court so finds as a matter of law.

■ 4. The contract is not one-sided or unfair. Defendants do not contest plaintiff's evidence that marine cargo insurance was provided by plaintiff as promised in the contract. Nor do they argue that the all-risk policy will not cover damage caused by acts of plaintiff's negligence. They merely object to paying the $25,000 deductible for damage caused by other than perils of the sea. Given Mr. Kelly's explanation of the policy, the fact that deductibles can be adjusted in policies of this type, and the discussions between the parties of the relationship of cargo insurance to risk of loss, there is no reason why defendant should not bear the risk when marine insurance will cover it. *Dow Chemical Co. v. Ashland Oil, Inc.,* 579 F.2d 902, 905 (5th Cir. 1978).

Nor is there unfairness in the limited choice of carriers available to defendants when negotiating their contract with Caribe. The evidence rebuts defendants' claim that Caribe alone could have performed the carriage. All parties agree that preliminary negotiations were held with Marine Development, Inc., another ocean carriage firm, but ended when the advantages of Caribe's larger barges became apparent. A third company, West India Shipping, also negotiated with defendants, but was eliminated chiefly because its ships were not U.S.-flag carriers. Nonetheless, Mr. F. A. KomLosy, in 1977 the operations manager for West India, testified in deposition that "we have plenty of competition" for Caribbean cargo transport. (Deposition of October 18, 1980, at 53.) Defendants' need for haste in executing a contract may have cut short their shopping. But Mr. Chapin's testimony, to the effect that notice of the time pressure would have given Mr. Ducich a bargaining chip, undercuts the suggestion that Mr. Ducich could have exploited that pressure to extract an unconscionable bargain.

There is likewise no untoward disparity in bargaining position between the parties. The Court has noted the extensive business experience of Messrs. Reyhan and Barter and the long legal career of their attorney, Mr. Chapin. The circumstances of negotiation of the carriage contract in this case display no duress or over-reaching by plaintiff. Represented by an experienced attorney during the crucial stages of negotiation, defendants cannot be said to have been at the mercy of unscrupulous dealers trying to pirate their business. Sangamo-Barter, in preparing to perform a seventeen-million dollar construction job, did not lack economic resources of its own. As the Fifth Circuit said in a slightly different context, "if the evidence were to show that in the present condition of the [tug and barge] industry no disparate relationship exists as to the respective bargaining position of contracting parties in these matters, then the [exculpatory] clauses constitute a valid defense." *Fluor Western, Inc. v. G&H Offshore Towing Co.,* 447 F.2d 35, 39 (5th Cir.

1971), *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972).

■ 5. Defendants seek to introduce parol evidence from Messrs. Reyhan and Barter to the effect that the written contract did not accurately reflect the agreement between the parties. Testimony was proffered at trial that, prior to the execution of the contract, Mr. Ducich verbally promised that all the cargo would be delivered to Haiti within forty-five days of March 1, 1977; that the barge would not first go to San Juan, Puerto Rico, as specified in the written agreement, but would instead proceed more or less directly to Haiti; and that plaintiff would assume the risk of loss or damage to the cargo except for acts of God which would be covered by insurance with a $25,000 deductible. This testimony was offered to show the true intent of the parties, to clarify alleged ambiguities, and to furnish particulars not covered in the contract.

The Court has already found that defendants understood their insurance coverage as explained to them by Mr. Kelly, that is, that the $25,000 deductible remained in effect for all loss or damage to cargo, however caused, excluding consequential losses from delay. Parol evidence to the contrary, even if admissible, does not alter that finding.

Assertions of deviation from the intended voyage course are unsupported by clear evidence that defendants ever made oral or written complaints to Caribe that the voyages were not being performed as planned.

Finally, although the Court does not take a wooden approach to parol evidence on the question of whether time was to be of the essence, *see Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1209 (2nd Cir. 1975), the complete lack of any written memorandum of delivery times, coupled with defendants' own testimony that plaintiff's agent, Mr. Ducich, persistently refused to reduce any delivery schedule to writing, leads the Court to read the contract as written and infer only that the parties intended a reasonable time for performance of the contract. *See A.M.R. Enterprises, Inc. v. United Postal Savings Association,* 567 F.2d 1277, 1281 (5th Cir. 1978).

■ 6. Having found that the parol evidence proffered should not work to vary the terms of the written contract, and having also found that the risk allocation and cargo insurance scheme was the subject of free and open negotiation between the parties, it remains for the Court to decide whether the exculpatory clauses relieving plaintiff of liability for cargo damage should be enforced.

Defendants argue that where the parties lack equal knowledge of the subject matter and applicable law and where a pattern of reliance by one party upon the other is shown, *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), requires that exculpatory clauses like these be struck down as contrary to public policy.

In its order of December 21, 1979, the Court refused to hold as a matter of law that *Bisso* applies only to towage contracts and has no bearing on private contracts of affreightment. The more circumspect route taken by the Court in *Hercules Powder, supra,* seemed the best way to develop a disputed set of facts. The Court's findings today make clear that defendants have failed to show under any of the *Hercules Powder* criteria—the individual contract, the factors which went into its making, the relative economic positions of the parties, and the general nature of the industry— why *Bisso* should work to defeat the arrangement made by these parties.

■ 7. The arrangement is a contract for private carriage. Styled as such in the written agreement, the contract provides that plaintiffs were to make the entire barge available for carriage of defendants' cargo alone. They had authority to carry cargo for no others. *See Alamo Chemical Transportation Co. v. M/V Overseas Valdez,* 469 F.Supp. 203, 209 (E.D.La.1979).

■ 8. The arrangement is also one of affreightment. Plaintiff agreed to transport defendants' equipment to Haiti by means of a tug and barge belonging to plaintiff. Plaintiff did not undertake mere-

ly to provide towage for a barge belonging to defendant. The tug and barge constituted a single conveyance. Unlike the arrangement in *Bisso*, there was no divided interest between the tug and barge owner. *Compare* 349 U.S. at 95, 75 S.Ct. at 635. ("[T]he owners of the barge being towed never had any relationship of any kind or character with those who controlled or operated the towboat.") *See Pure Oil Co. v. M/V Caribbean*, 235 F.Supp. 299, 304 (W.D. La.1964), *aff'd*, 370 F.2d 121 (5th Cir. 1966).

■ 9. In private contracts of affreightment, barring the presence of factors suggesting an unconscionable bargain (as in *Hercules Powder, supra* ), the relationship is one of bailment and the rights and obligations of one party to the other are to be determined according to the terms of the agreement. *See Commercial Molasses Corp. v. New York Tank Barge Co.*, 314 U.S. 104, 110, 62 S.Ct. 156, 160, 86 L.Ed. 89, (1941). There has been no suggestion by either party that the contract here was intended to incorporate the provisions of the Harter Act, 46 U.S.C. § 190 *et seq.*, or of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.*, limiting a carrier's ability to contract against the consequences of its own negligence. As the court said in *Kerr-McGee Corp. v. Law*, 479 F.2d 61 (3rd Cir. 1973), when considering an exculpatory clause whereby the shipper waived all claims for loss, damage and/or expense against the carrier no matter what the nature or cause,

Nor does the clause contravene public policy. Although section 1 of the Harter Act, 46 U.S.C. § 190, forbids stipulations against negligence by carriers, the Act applies only to contracts of common carriage unless it is specifically incorporated into the agreement for private affreightment. [citations omitted]. The district court found, and the parties do not suggest otherwise, that the cargo was shipped under a contract of private carriage. Section 1 of the Harter Act was not incorporated into the transportation agreement. Allied and Kerr-McGee, therefore, were free to make whatever

contractual allocation of risk they desired. [citations omitted]. Kerr-McGee's reliance on *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), does not require a contrary result. Mr. Justice Black was careful to point out that the decision was based on the particular nature of the tug-tow relationship, and specifically stated that the considerations which invalidated exculpatory clauses in towage contracts did not necessarily command a similar result in other maritime contracts. 349 U.S. at 91, 93, 75 S.Ct. 629. Both before and after *Bisso*, it has been held that exculpatory clauses in private contracts of affreightment are not contrary to public policy. [citations omitted].

479 F.2d at 64.

■ 10. The fact that defendants were obligated to pay a $25,000 deductible on their cargo insurance policy does not make that insurance an inadequate remedy for any loss suffered. As the court in *Hercules Powder* pointed out, *Bisso*'s public policy analysis would not automatically invalidate liability limitations where the contract rate included adjustment for cargo insurance to be obtained by the shipper. That is, the carrier could reduce its liability consonant with *Bisso* where it knew the shipper agreed to bear the loss by insuring its own cargo. 270 F.Supp. at 680. Here the equities cut even more strongly in plaintiff's favor. Plaintiff fulfilled its obligation to provide standard all-risk marine insurance at its own expense, naming defendants as additional assureds on its policy. The fact that plaintiff added defendants to an existing policy does not render the coverage inadequate or self-serving; and had defendants found it so, they could have obtained their own insurance, with a lower deductible if desired. Indeed, defendants have not been heard to allege that the insurance will not cover cargo damage resulting from plaintiff's negligence (subject, of course, to the deductible.) Their attempt now to alter the terms of the coverage in force must fail.

■ 11. Generally, the parties in this case were free to contract to adjust the

risk of cargo loss or damage as they saw fit. *See In re: Complaint of International Marine Development Corp.*, 451 F.2d 763, 765 (5th Cir. 1971); *Tenneco Oil v. Tug Tony*, 324 F.Supp. 834, 837 (S.D.Tex.1971); *Coastal States Petrochemical Co. v. Montpelier Tanker Corp.*, 321 F.Supp. 212, 219 (S.D. Tex.1970). The parties having done so, the Court having found that defendants freely and knowingly bargained for cargo insurance in return for exculpation of plaintiff's liability for cargo damage, and the Court having further found that defendants failed to show knowledge on the part of plaintiff or its agents on which liability for consequential delay and attendant damages might be predicated, the Clerk shall enter judgment against defendants jointly and severally in the amount of $120,702.68 and costs, without set-off, and by separate order the Court shall dismiss defendants' counterclaim.