766 F.Supp. 754 (1991)
CONSOLIDATED GRAIN AND BARGE COMPANY, et al., Plaintiffs,
v.
AMERICAN BARGE AND TOWING COMPANY, et al., Defendants.
No. 89-0853A(6).
United States District Court, E.D. Missouri, E.D.
June 12, 1991.
James W. Herron, St. Louis, Mo., for plaintiffs.
Frank S. Thackston, Jr., Lake, Tindall, Hunger & Thackston, Greenville, Miss., Gary D. McConnell, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for defendants.

*755 MEMORANDUM OPINION
GUNN, District Judge.
This matter is before the Court on the merits of plaintiffs' claims after a two-day non-jury trial. The Court having considered the pleadings, the testimony of the witnesses, the deposition testimony, the documents in evidence and the joint stipulation of the parties, and being fully advised in the premises, makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

FINDINGS OF FACT
1. Consolidated Grain & Barge Company (Consolidated) is a corporation duly organized and existing under law and engaged in the business of buying and selling grain and other commodities.
2. International Marine Underwriters, Inc. (IMU) is a corporation duly organized and existing under law and engaged in the business of marine insurance.
3. American Barge and Towing Company (American) is a corporation duly organized and existing under law and engaged in the business of moving bulk grains and other similar cargoes on the Inland River System by barges and towboats operated by American.
4. American Milling Company (American Milling) is a corporation duly organized and existing under law.
5. On April 4, 1988, American agreed with American Milling to move grain cargoes from Granite City, Illinois to the New Orleans, Louisiana area in barges provided by American. American Milling and American exchanged American Freight Confirmation No. 3241 and American Milling Confirmation No. 1329. This arrangement between American Milling and American is commonly referred to as the sale of freight by a carrier, in this case American. Thereafter American Milling sold the freight to Consolidated on June 20, 1988 for transportation of cargo therein from Granite City to New Orleans.
6. The documents exchanged in conjunction with that transaction were American Milling Confirmation of Barge Freight Sales Contract No. 1385 and Consolidated purchase confirmation No. 26710. Contracts for private carriage of bulk cargoes are traded as commodities in the river industry. The contracts entered into between American and American Milling concerning the agreement for movement of the cargo included a provision that the carrier, American in this case, would insure the cargo being carried for the benefit of shipper and consignee. On June 20, 1988, American Milling sold one of the agreed movements of cargo to Consolidated. Pursuant to that agreement, Consolidated and American executed written standard contracts containing language substantially identical to the language contained in the agreement between American Milling and American, including the provision outlining the carrier's obligation to provide insurance on and for the benefit of the cargo being carried.
7. Pursuant to its agreement with American Milling, American provided barge RM-245B, a typical jumbo hopper barge for carriage of bulk cargoes in the Mississippi River. Barge RM-245B has exterior dimensions of two hundred foot length by thirty-five foot width by twelve foot hull depth. The large, undivided cargo box is covered by nine interlocking fiberglass cargo covers and each cargo cover has two grain doors, one to port and the other to starboard. American Milling directed that barge RM-245B be placed by American for movement of Consolidated's cargo. Barge RM-245B was constructively placed for loading at Granite City, Illinois on June 20, 1988 at 7:00 a.m. Beginning on June 22 and ending on June 25, 1988, barge RM-245B was loaded with 1,527.33 net tons of maize by-product expeller pellets at the APC Warehouse Company Terminal in the Chain of Rocks Canal near Granite City for movement to the New Orleans area where such cargo would be transferred to an ocean vessel for export to Europe. At the time of loading and releasing of the barge to American, the cargo was not damaged as reflected by the samples taken for analysis at the point of origin.
*756 8. On June 25, 1988, Consolidated, acting as agent for American pursuant to a written agreement authorizing the issuance on a form provided by American, issued American's Bill of Lading covering the 1527.33 net tons of maize by-product pellets loaded onto barge RM-245B in order to expedite the billing and the collection of the purchase price of the sale of cargo to the consignee. The Bill of Lading listed American as the carrier and Consolidated as the shipper and consignee. The Bill of Lading was a standard American form provided by American for issuance by Consolidated.
9. On June 28, 1988, Consolidated sold and consigned the cargo to Kurt A. Becher, c/o Overseas Commodities Corporation (OCOMCO), for a total of $224,517.51, $147.00 a net ton and C.I.F. destination. Becher paid the purchase price on June 30, 1988 prior to the arrival of the cargo at destination.
10. On June 29, 1988, RM-245B was released to American and arrived at Upper St. Rose Fleet at Mile 127 UMR near New Orleans on July 27, 1988. American paid for and scheduled the movement of barge RM-245B on July 30, 1988 from Upper St. Rose Fleet to thirty-one miles downriver to Covenant Marine Fleet, the staging fleet for the Delta Bulk Terminal's Cargo Transfer Rig and the location used for the transshipment of barge cargoes to ocean-going freighters.
11. Employees of Russell Marine Supervisory Services (Russell), agents for the consignee, conducted an inspection of the cargo on July 29, 1988 shortly after the arrival of the cargo at destination near New Orleans. This inspection disclosed that the cargo under the No. 7 cargo cover was wet, hardened and blackened over the width and length of the cover to an undetermined depth, and the remainder of the cargo was of medium compact. The analysis of the cargo taken by Russell after barge RM-245B's arrival determined a low to moderate content of moisture in the pellets. Approximately one thousand five hundred pounds of damaged cargo was present under the cover. Russell further determined that there were fractures in the No. 7 cargo cover, and water had entered the cargo hopper through the fractures and damaged the cargo under the cargo cover.
12. In the joint stipulation entered on March 30, 1990, American agreed that it is liable to plaintiffs for the one thousand five hundred pounds of damaged cargo present on July 29, 1988 and does not contend that it exercised due diligence in making the barge seaworthy in all respects at or prior to the inception of the voyage or that it is entitled to the benefit of the Harter Act, 46 U.S.C.App. §§ 190-196. The parties' joint stipulation does not address the responsibility or liability of American for any subsequent damage sustained to the cargo after July 29, 1988.
13. Mark Fletcher of Consolidated notified American concerning the Russell inspection and the finding of the damaged cargo and the cargo cover. Consolidated informed American that the cargo on barge RM-245B could not be loaded onto the ocean-going vessel TREBIZOND so long as the damaged cargo remained on the barge and instructed American to remove the damaged cargo so that the remaining cargo on RM-245B could be loaded onto the TREBIZOND. On August 1, 1988, Fletcher discussed with Jack Haskell of American the removal of the damaged cargo. On August 3, 1988, Haskell indicated that American would investigate and take care of the damaged cargo problem so that barge RM-245B could be taken to the transfer rig. On August 5, 1988, American advised the consignee's representative that American would have the damaged cargo removed from barge RM-245B in preparation for loading onto the TREBIZOND. Two laborers working with shovels and buckets could have removed the damaged cargo by passing the cargo through doors in the damaged cover in approximately two hours without removing the No. 7 cargo cover.
14. The common practice in the New Orleans area is for the carriers to be responsible for culling damaged cargo caused by defects in or unseaworthiness of the carrying vessel so that the consignee will accept the cargo for loading on a vessel.
*757 15. Russell scheduled barge RM-245B's cargo for loading to begin on August 4, 1988 onto the ocean-going vessel TREBIZOND. The TREBIZOND completed loading during the afternoon of August 10, 1988.
16. In the morning of August 8, 1988, Bruce Davis of Russell contacted Norman Antrainer instructing him that barge RM-245B was scheduled to discharge into the TREBIZOND within the next twenty-four hours and that he needed to make arrangements for barge RM-245B's damaged cargo to be culled out. As a result of barge RM-245B's not being ready to load, another barge loaded in its place. The cargo of barge RM-245B could have been loaded into the TREBIZOND if American had removed the damaged cargo as promised. Instead of removing the damaged cargo, American placed a plastic visquine sheeting over cargo cover No. 7 to prevent water damage until the cargo could be loaded on another ocean-going vessel, the KONPOLIS, later in August.
17. A survey performed by Russell on August 9, 1988 disclosed that the damaged cargo had not been removed and was progressing. The cargo was wet and moldy in several locations.
18. On August 15, 1988, Russell conducted another inspection of the cargo on barge RM-245B to determine the status of its cleaning. None of the damaged cargo had been removed, and the cargo was showing signs of heating.
19. Even though the cargo remained in American's care, custody, and control, American did nothing to monitor the condition of the cargo until American participated in a joint survey with Russell on August 22, 1988 in preparation for loading the cargo into the KONPOLIS. The joint survey disclosed that the cargo was heated in a number of locations throughout the barge and that there were three thousand pounds of damaged cargo under cover No. 7. The temperature of the cargo ranged from 145 degrees to 200 degrees.
20. The KONPOLIS started loading on August 25, 1988 and finished loading on August 30, 1988.
21. After being advised of the further deterioration of the cargo, Consolidated notified American that it was rejecting the cargo on barge RM-245B back to American. American responded by denying all liability and responsibility for any of the damaged cargo. American further stated that it was holding Consolidated liable for all damages to the covers and cargo of barge RM-245B and requested that it be advised if Consolidated was abandoning barge RM-245B to American's control so that American could take necessary action to mitigate any possible future loss.
22. On August 25, 1988, Consolidated advised American that it denied any and all liability for the damages to the cargo on barge RM-245B. American and OCOMCO agreed to transfer as much of the cargo as possible into the KONPOLIS and scheduled this transfer for August 29, 1988.
23. On August 29, 1988, temperature probes of the cargo showed readings ranging from 120 degrees to 209 degrees. The cargo was hot, gaseous, black and insect infested. Significant cargo damage occurred between August 22, 1988 and August 29, 1988. OCOMCO decided not to have the cargo loaded for transshipment and formally rejected the cargo for loading onto the KONPOLIS. Consolidated issued its credit memo to OCOMCO and refunded the amount of the purchase price, $224,-517.51.
24. American decided to sell the cargo at salvage and decided to use the closed bid procedure. This procedure was designed to bring the highest price for the damaged cargo on barge RM-245B. American contacted prospective salvage buyers and invited them to bid on the cargo in a closed bid process. In such a bidding process, the salvage buyers bid without any information concerning the bids of the other prospective salvors. The high bidder Houston Grain agreed to pay $81.26 per transferred short ton and paid a total amount of $115,-788.19 for 1,424.91 tons. After examining the cargo and prior to making its bid, Houston Grain contacted Consolidated to inquire whether it would be interested in purchasing the cargo if American accepted *758 Houston Grain's bid on the cargo. Consolidated advised Houston Grain that it would be willing to pay $85.00 per short ton, based on the weights of the cargo after transfer to receiving barges. Houston Grain did not know that Consolidated had produced the product or was the shipper of the cargo. Like other bidders in this closed bid process, Houston Grain is not an end user of the product and places bids with an expectation of reselling the product purchased at a profit.
25. On September 1, 1988, Consolidated transferred the cargo on barge RM-245B into two receiver barges, barges CGB-343 and CGB-109. Consolidated transferred 1,176.93 tons of cargo into barge CGB-343 by aerating the cargo after inspection. Consolidated transferred 247.98 tons of cargo into barge CGB-109 and transported this cargo to Granite City for reconditioning. Consolidated purchased a total of 1,424.91 tons for a total amount of $121,117.35, based on the weights of the product after being separated into the two receiving barges. Consolidated lost a total of 102.42 tons of cargo in the transfer.
26. On September 2, 1988, Russell advised OCOMCO of the results of the cargo transfer. The temperature of the cargo on barge CGB-343 ranged from 99 to 119 degrees and the color of the cargo was good.
27. Consolidated sold the cargo in barge CGB-343 to OCOMCO at a price equal to the full market price at the time, $132.00 per ton. On September 7, 1988, barge CGB-343 loaded its cargo on the ocean-going vessel, the KOSMAG, without exception noted. After reconditioning the cargo on barge CGB-109 in Granite City at Consolidated's plant, Consolidated sold the 247.98 tons of cargo to OCOMCO at the full market price.
28. John Whittenburg, Consolidated's expert, testified that the compaction of the cargo caused the deterioration of the cargo and that over time the settling of the cargo and the loss of airspace between the pellets had generated heat. He noted that pelletized cargoes necessarily contain moisture and are susceptible to becoming compacted resulting in the deterioration in the form of heating if such cargoes remain in the barges in hot and humid weather for substantial periods of time. He further testified that the longer the barge remained loaded with the cargo, the greater the heating and deterioration of the cargo.
29. IMU, Consolidated's cargo insurer, paid Consolidated $106,375.83, representing the amount of Consolidated's claim under its cargo insurance policy minus $5,000.00 deductible under IMU's policy.

CONCLUSIONS OF LAW
1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1333, which is admiralty jurisdiction. The appropriate substantive law to be applied in an admiralty action is federal maritime law. Complaint of Valley Towing Serv. v. M/V CITY OF GREENVILLE, 629 F.Supp. 139, 144 (E.D.Mo.1985).
2. "Admiralty is essentially the law of equity and courts are privileged to exercise flexibility and award what is fair." Complaint of Valley Towing Serv. v. M/V CITY OF GREENVILLE, 629 F.Supp. at 147 (citing Pizani v. M/V COTTON BLOSSOM, 669 F.2d 1084, 1089 (5th Cir.1982)). The hands of the court are not tied by the rigid and technical rules of the common law. Id.
3. Neither party has suggested that the contracts of affreightment in this case were intended to incorporate the provisions of the Harter Act, 46 U.S.C.App. §§ 190-196 or of the Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300-1315, limiting a carrier's ability to contract against the consequences of its own negligence. Caribe Tugboat Corp. v. J.D. Barter Constr. Co., 509 F.Supp. 312, 322 (M.D.Fla.1981).
4. In private contracts of affreightment, such as the case before the Court, the relationship is one of bailment, and the rights and obligations of one party to the other are to be determined according to the terms of the agreement, unless such terms are unconscionable. Caribe Tugboat Corp. v. J.D. Barter Constr. Co., 509 F.Supp. at 322. The carrier American is liable as bailee for the safe carriage of the cargo in *759 its barge. Close v. Anderson, 442 F.Supp. 14, 16 (W.D.Wash.1977). The agreement between the parties is contained in the prior written agreements so that the Bill of Lading served as a receipt and document of title and did not modify or amend the contract of carriage of the parties. 2A Benedict on Admiralty, § 34 at 4-14 (7th ed. 1989).
5. Under maritime law, American as the barge owner had a duty to exercise due care in the management and transportation of the cargo and to provide a seaworthy barge reasonably fit to carry the particular cargo which it had undertaken to transport. Fed. Barge Lines v. Granite City Steel, Div. of Nat'l Steel Corp., 608 F.Supp. 142, 147 (E.D.Mo.1985); Dravo Mechling Corp. v. Standard Terminals, Inc., 557 F.Supp. 1162, 1166 (W.D.Pa. 1983). When a carrier accepts cargo offered for shipment, the carrier is charged as a matter of law with knowledge of the cargo's nature and characteristics and is obligated to exercise due care in the handling of the cargo. Amerada Hess Corp. v. S.S. PHILLIPS OKLAHOMA, 558 F.Supp. 1164, 1168 (S.D.N.Y.1973).
6. The cargo owner's prima facie case for recovery of the value of the cargo is established upon proof that the cargo was delivered in apparent good order and condition to the carrier and is subsequently delivered in damaged condition at destination. Continental Grain Co. v. American Commercial Barge Line Co., 332 F.2d 26, 27-28 (7th Cir.1964); Amerada Hess Corp. v. S.S. PHILLIPS OKLAHOMA, 558 F.Supp. at 1167. Upon such proof, the shipper and consignee make a prima facie case of negligence on the part of the carrier.
7. American contends that the cargo on barge RM-245B became the responsibility of the consignee on the barge's constructive placement at Covent Marine on July 28, 1988 and asserts that Consolidated is limited to the damages measurable at that point in time. Farrell Lines, Inc. v. Highlands Ins. Co., 696 F.2d 28 (2d Cir. 1982); Fraiser-Smith Co. v. Chicago, Rhode Island & Pacific R.R., 435 F.2d 1396 (8th Cir.1971); F.J. McCarty Co. v. Southern Pacific Co., 428 F.2d 690 (9th Cir.1970).
8. The Court finds that the principles enunciated in the above-listed cases are not applicable to the issues presented to the Court, because American did not stand on its delivery but instead agreed to correct the condition of the cargo by removing the damaged cargo so that the cargo on barge RM-245B could be loaded onto the ocean-going vessel TREBIZOND. The Court concludes that American had not relinquished care, custody and control of the cargo upon arrival at Covent Marine Fleet and, consequently, was in a much better position to protect the cargo against any further damage. American deferred tender of delivery until the time it removed the damaged cargo as agreed. The Court finds that the cargo could have been culled at a minimum cost and effort if American had removed the damaged cargo as promised. The Court notes that the custom and practice in the New Orleans area is for the carrier to correct visible damage to the cargo caused by defects or unseaworthiness of the carrying vessel.
9. The Court also finds that the cargo was in good condition when delivered into the barge. Test samplings taken from probes of the cargo performed at the conclusion of loading and at destination establish that the pellets were well within the normal range of moisture. Based upon the records of the United States Weather Bureau, the Court concludes there was no rainfall on June 22, 1988 through June 29, 1988, covering the loading period and the period up to the release of barge RM-245B to American, so that rain could not have entered the cargo boxes during the time of loading.
10. The Court further finds that American failed to use due diligence to make RM-245B seaworthy in all respects as shown by the openings and fractures in the No. 7 cargo cover as well as other cargo covers on barge RM-245B.
11. The Court further concludes that Consolidated relied on the representations *760 of American concerning American's agreement to remove the damaged cargo in order to permit the loading of the cargo onto the vessel TREBIZOND. The Court finds that Consolidated had a right to rely on American's representations concerning the removal of the damaged cargo, because American had a duty to avoid reasonable delay in the movement of the cargo that may have caused injury or ruin to it. United States Shipping Bd. Emergency Fleet Corp. v. Texas Star Flour Mills, 12 F.2d 9, 9-11 (5th Cir.1926). The Court concludes that American's delay in removing the damaged cargo set in motion the progressive cause of its damage and subsequent deterioration. The liability of American extended until the time of discharge of the cargo and continued thereafter as bailee until the consignee accepted it. Internatio, Inc. v. M/V YINKA FOLAWIYO, 480 F.Supp. 1245, 1250 n. 4 (E.D.Pa.1979).
12. The Court finds that as a result of American's failure to cull the damaged cargo or to take any other steps to make it acceptable for loading onto the KONPOLIS, American caused the cargo not to be loaded and allowed it to continue to deteriorate.
13. The Court concludes that Consolidated properly rejected the cargo back to American due to American's failure to cull the damaged portions as promised and negligence in allowing it to further deteriorate.
14. The measure of damages applicable to cases in which the cargo is damaged rather than lost is the difference between the market value of the cargo at the port of destination, $147.00 per ton for a total of $224,517.51, and the reasonable market value of the cargo in its damaged condition. Int'l Barges, Inc. v. Kerr-McGee Corp., 579 F.2d 1204, 1210 (10th Cir.1978). The Court concludes that there appears to be some range within which the Court can select a measure of damages for the purpose of arriving at a result which conforms to the general rules of damages and which also reflects the particular facts of the case. Id. The Court finds that the reasonable market value of the cargo in its damaged condition is $132.00 for the 1,176.93 tons of cargo loaded onto barge CGB-343 for a total of $155,354.76. Consolidated sold the 1,176.93 tons of cargo at the market price of $132.00 by aerating it and then transferring it to the KOSMAG where it was loaded without exception noted. The Court finds that the reasonable market value of the cargo in its damaged condition is $81.26 for the 247.98 tons of cargo loaded onto barge CGB-109, for a total of $20,-150.85. Consolidated transported this cargo back to Granite City to be reconditioned and thereafter sold it at the market price. The Court finds that the reasonable market value for the 102.42 tons of cargo lost in the transfer to be $81.26 per ton, for a total of $8,322.65.
15. The parties have stipulated that American is liable for the damage to the 1500 pounds of cargo found at destination in the amount of $147.00 per ton, for a total of $110.25.
16. The Court will also award Consolidated $817.50 representing the amount of costs incurred for marine surveying costs as a result of the damage and $1,829.00 representing the amount retained from the proceeds of the salvage sale.
17. The general rule of the Eighth Circuit in admiralty cases is that prejudgment interest should be routinely awarded in the absence of exceptional or peculiar circumstances. Cargill, Inc. v. Commercial Union Ins. Co., 889 F.2d 174, 181 (8th Cir. 1989) (citing Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372, 373 (8th Cir.1980)). Accordingly, the Court finds that prejudgment interest is in order and awards it at ten per cent (10%) simple interest from August 31, 1988 to the date of judgment, as stipulated by the parties.

JUDGMENT
Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiffs shall recover of defendant the sum of $43,446.00, with interest thereon at the rate of *761 ten per cent (10%) per annum from August 31, 1988 to the date of judgment.